**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RISEANDSHINE CORPORATION d/b/a
RISE BREWING

                Plaintiff,

     vs.

PEPSICO, INC.

                Defendant.

CASE NO.: 1:21-cv-06324-LGS

Honorable Lorna Schofield

JURY TRIAL DEMANDED

**DEFENDANT'S OPPOSITION TO**
**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

I.    STATEMENT OF FACTS ............................................................................ 2

    A.    MTN DEW RISE ENERGY is part of the famous MTN DEW product line......... 2

    B.    MTN DEW RISE ENERGY is an innovative energy drink, with packaging that emphasizes its energy credentials, benefits, and MTN DEW heritage. .................. 3

    C.    MTN DEW RISE ENERGY is marketed as a MTN DEW energy drink—not a coffee replacement. ................................................................................................ 4

    D.    PepsiCo developed MTN DEW RISE ENERGY independently. .......................... 5

    E.    RBC delayed for months before seeking relief, while PepsiCo went forward in good faith, with significant expense and success, and no evidence of confusion. . 6

II.   ARGUMENT ......................................................................................................... 8

    A.    RBC has not shown a likelihood of success on the merits. ..................................... 9

        i.    There is no evidence of actual consumer confusion (*Polaroid* factor 5). . 10

        ii.    RBC's marks are weak, making it unlikely to prevail. ............................. 13

            1.    The weakness of RBC's marks shows no likelihood of confusion (*Polaroid* factor 1). ............................................................... 13

            2.    RBC has not shown a likelihood that its asserted common-law marks are entitled to protection...................................................... 16

        iii.    The parties' marks are not confusingly similar (*Polaroid* factor 2). ........ 17

        iv.    The parties' products are different (*Polaroid* factor 3)............................. 20

        v.    PepsiCo adopted its mark in good faith (*Polaroid* factor 6). .................... 20

        vi.    There is no evidence RBC will "bridge the gap" and sell energy drinks (*Polaroid* factor 4). ................................................................................ 21

        vii.    PepsiCo's MTN DEW RISE ENERGY drinks are at least equal in quality to RBC's products (*Polaroid* factor 7)...................................................... 22

        viii.    RBC put in no evidence on consumer sophistication (*Polaroid* factor 8). 22

    B.    RBC shows neither serious questions on the merits nor a balance of hardships tipping decidedly in its favor. ............................................................................... 23

        i.    RBC has no evidence of harm from PepsiCo's sales of MTN DEW RISE ENERGY, much less irreparable harm. ..................................................... 23

        ii.    An injunction would cause significant, irreparable harm to PepsiCo........ 24

   CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*27-24 Tavern Corp. v. Dutch Kills Centraal*,
  No. 14-CV-1625-FB-RER, 2015 WL 5772158 (E.D.N.Y. Sept. 29, 2015) .....................24, 25

*3BA Int'l LLC v. Lubahn*,
  No. 10-CV-829 (RAJ), 2010 WL 2105129 (W.D. Wash. May 20, 2010) ..............................25

*Alacritech, Inc. v. Microsoft Corp.*,
  No. 04-CV-03284 (JSW), 2005 WL 850729 (N.D. Cal. Apr. 12, 2005) ................................25

*Alpha Media Grp., Inc. v. Corad Healthcare, Inc.*,
  No. 13 Civ. 5438 (WHP), 2013 WL 5912227 (S.D.N.Y. Nov. 4, 2013) ...............................14

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*,
  No. 10 Civ. 3314 (RWS), 2015 WL 4033019 (S.D.N.Y. June 29, 2015) ..............................24

*Arrow Fastener Co., Inc. v. Stanley Works*,
  59 F.3d 384 (2d Cir. 1995) ...................................................................................................21

*Brockmeyer v. Hearst Corp.*,
  248 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................................10

*Buitono Foods Corp. v. Gio Buton & C. S.p.A.*,
  680 F.2d 290 (2d Cir. 1982) .................................................................................................22

*Buti v. Perosa, S.R.L.*,
  139 F.3d 98 (2d Cir. 1998) ...................................................................................................16

*Cadbury Beverages, Inc. v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996) ...................................................................................................22

*Cheng v. Dispeker*,
  No. 94-CV-8716 (LLS), 1995 WL 86353 (S.D.N.Y. Mar. 2, 1995) ...............................23, 24

*Citigroup Inc. v. AT&T Servs., Inc.*,
  No. 16-CV-4333 (KBF), 2016 WL 4362206 (S.D.N.Y. Aug. 11, 2016) .........................23, 24

*Coastal Distribution, LLC v. Town of Babylon*,
  No. 05-CV-2032 (JS) (ETB), 2005 U.S. Dist. LEXIS 40795 (E.D.N.Y. July 15, 2005) ........25

*Cumberland Packing Corp. v. Monsanto Co.*,
  140 F. Supp. 2d 241 (E.D.N.Y. 2001) ..................................................................................10

*Downloadcard, Inc. v. Universal Music Grp., Inc.*,
    No. 02 Civ. 7710 (CSH), 2002 WL 31662924 (S.D.N.Y. Nov. 26, 2002) ............................25

*Engine Capital Mgmt., LP v. Engine No. 1 GP LLC*,
    No. 21 Civ. 149 (VM), 2021 WL 1372658 (S.D.N.Y. Apr. 12, 2021) ........................9, 11, 24

*Essence Commc'ns, Inc. v. Singh Indus., Inc.*,
    703 F. Supp. 261 (S.D.N.Y. 1988) ................................................................................11

*Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*,
    252 U.S. 538 (1920) ................................................................................................19

*First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc.*,
    No. 02-CV-3691 (DLC), 2004 WL 1575396 (S.D.N.Y. July 15, 2004) ................................21

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
    432 F.3d 463 (3d Cir. 2005) ............................................................................12, 15, 21

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
    13 F. Supp. 2d 417 (S.D.N.Y. 1998) ..............................................................1, 2, 3, 4, 5

*Grand River Enter. Six Nations Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ............................................................................................24

*Interlink Int'l Fin. Servs., Inc. v. Block*,
    145 F. Supp. 2d 312 (S.D.N.Y. 2001) ................................................................................7

*Ivoclar N. Am., Inc. v. Dentsply Int'l, Inc.*,
    41 F. Supp. 2d 274 (S.D.N.Y. 1998) ................................................................................25

*Jahr Printing & Pub. Co. v. Meredith Corp.*,
    991 F.2d 1072 (2d Cir. 1993) ................................................................................9, 10

*Juice Generation, Inc. v. GS Enters. LLC*,
    794 F.3d 1334 (Fed. Cir. 2015) ................................................................................15

*Kate Spade LLC v. Saturdays Surf LLC*,
    950 F. Supp. 2d 639 (S.D.N.Y. 2013) ................................................................................16

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
    495 F.2d 1265 (2d Cir. 1974) ................................................................................16

*Lang v. Ret. Living Publ'g Co., Inc.*,
    949 F.2d 576 (2d Cir. 1991) ..........................................11, 12, 13, 14, 15, 17, 19

*Lapine v. Seinfeld*,
    375 F. App'x 81 (2d Cir. 2010) ................................................................................20

*Le Cordon Bleu S.a.r.l. v. BPC Pub. Ltd.*,
   327 F. Supp. 267 (S.D.N.Y. 1971) ..................................................................23

*Long Island-Airports Limousine Serv. Corp. v. New York Airport Servs. Corp.*,
   641 F. Supp. 1005 (E.D.N.Y. 1986) ...............................................................25

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2018)..............................................................14

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)...........................................................................................9

*Mejia and Assocs., Inc. v. Int'l Bus. Machines Corp.*,
   920 F. Supp. 540 (S.D.N.Y. 1996) .............................................................18, 19

*Merriam-Webster, Inc. v. Random House, Inc.*,
   35 F.3d 65 (2d Cir. 1994)..................................................................................11

*Multi-Vet Ltd. v. Premier Pet Prod., Inc.*,
   No. 08-CV-3251 (LMM), 2008 WL 3914845 (S.D.N.Y. Aug. 22, 2008)...........16

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
   580 F.2d 44 (2d Cir. 1978).................................................................................11

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018)...................................................................................9

*Nabisco, Inc. v. Warner-Lambert Co.*,
   220 F.3d 43 (2d Cir. 2000)................................................................9, 17, 18, 19

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
   269 F.3d 114 (2d Cir. 2001)...............................................................................11

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   590 F. Supp. 2d 500 (S.D.N.Y. 2008)...............................................................21

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
   86 F. Supp. 2d 305 (S.D.N.Y. 2000)..................................................................10

*Pan Am. World Airways, Inc. v. Flight 001, Inc.*,
   No. 06-CV-14442 (CSH), 2007 WL 2040588 (S.D.N.Y. July 13, 2007)............25

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*,
   390 F.3d 158 (2d Cir. 2004)..........................................................................17, 18

*Plus Prods. v. Plus Disc. Foods, Inc.*,
   722 F.2d 999 (2d Cir. 1983)..........................................................13, 14, 15, 20

*Reply All Corp. v. Gimlet Media, LLC*,
  843 F. App'x 392 (2d Cir. 2021) ........................................10

*Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999)...............................................9

*Star Indus., Inc. v. Bacardi & Co. Ltd.*,
  412 F.3d 373 (2d Cir. 2005)...................................14, 21, 22

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009)..........................................22, 23

*Streetwise Maps, Inc. v. VanDam, Inc.*,
  159 F.3d 739 (2d Cir. 1998)..............................................19

*Swedish Beer Export Co. Aktiebolag v. Canada Dry Corp.*,
  469 F.2d 1096 (C.C.P.A. 1972) ..........................................20

*Tiffany & Co. v. Costco Wholesale Corp.*,
  971 F.3d 75 (2d Cir. 2020)...............................................16

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995)...............................................23

*Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*,
  964 F. Supp. 733 (S.D.N.Y. 1997) ......................................11

*Vitarroz Corp. v. Borden, Inc.*,
  644 F.2d 960 (2d Cir. 1981)..............................................20

*W.W.W. Pharm. Co. v. Gillette Co.*,
  984 F.2d 567 (2d Cir.1993)...............................................18

*Water Pik, Inc. v. Med-Sys., Inc.*,
  726 F.3d 1136 (10th Cir. 2013) .........................................11

**STATUTES**

15 U.S.C. § 1116(a) ........................................................23

**OTHER AUTHORITIES**

4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed.) ..........................................8

Plaintiff RiseandShine Corporation d/b/a Rise Brewing ("RBC") has not met its heavy burden of justifying an injunction. It has shown no basis to enjoin Defendant PepsiCo, Inc. from marketing innovative, fruit-flavored energy drinks that have been on sale nationwide for nearly five months without any consumer confusion. RBC's motion should be denied.

**RBC is not likely to succeed on the merits:** There is no likelihood of confusion as to PepsiCo's MTN DEW RISE ENERGY drinks and RBC's coffee drinks. Two independent experts conducted surveys that show no likelihood of consumer confusion – RBC has submitted no survey evidence. The absence of confusion is not surprising: PepsiCo's MTN DEW RISE ENERGY product is a large 16-ounce fruit-flavored energy drink with distinct packaging sold under the famous MTN DEW brand that is marketed against other energy drinks; RBC's 7-ounce coffees are sold under the mark RISE BREWING CO., marketed against other coffees. The mere appearance of the commonly used and highly suggestive word "RISE" does not make for a strong mark. RBC stakes its request for dramatic relief on the word, despite having told the U.S. Patent and Trademark Office ("USPTO") that "RISE" is "extremely weak and diluted" with "little source identifying significance" because of widespread third party registrations and uses of the word. The facts are consistent with RBC's admission: the evidence shows that consumers understand the difference between marks containing the word "RISE" and distinguish the marks and goods based on overall differences. RBC's claims will not succeed.

**RBC has no evidence of irreparable harm**: RBC's delay in seeking a preliminary injunction—waiting over five months after contacting PepsiCo on January 11, 2021—shows RBC did not believe there is any imminent risk of irreparable harm. *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) (observing that courts in this district "typically decline to grant preliminary injunctions in the face of unexplained delays of more than

two months"). Notwithstanding its knowledge of PepsiCo's use of MTN DEW RISE ENERGY for months, RBC has been unable to marshal any evidence of actual harm. RBC merely speculates about potential investor concerns. PepsiCo is not to blame for RBC's perceived business shortcomings; the motion should be denied.

## I. STATEMENT OF FACTS

### A. MTN DEW RISE ENERGY is part of the famous MTN DEW product line.

MTN DEW RISE ENERGY is a significant addition to the MTN DEW family of products—one of the most well-known beverage brands in America. *See* Declaration of Fabiola Torres ("Torres Decl.") ¶ 3. The MTN DEW beverage, which was created in the 1940s and acquired by PepsiCo in 1964, is often touted as the original energy drink. *Id.* PepsiCo has continuously and substantially marketed, advertised, promoted, and sold beverages with the MTN DEW brand for over 50 years. *Id.* As part of this strong heritage, PepsiCo has long considered how best to leverage the MTN DEW brand in the energy beverage category. *Id.* ¶ 4.

Contrary to RBC's conclusory allegations, MTN DEW RISE ENERGY is not PepsiCo's first venture into what RBC artificially calls a "morning caffeine beverage category" (RBC's invented "category" is not typically used in the beverage industry). *Id.* ¶ 25. PepsiCo has sold ready-to-drink coffees for decades through its partnership with Starbucks; plus, MTN DEW KICKSTART beverages with caffeine launched with the tagline "Kickstart Your Day," and have been on the market for many years. *Id.* PepsiCo more recently has been investing significantly in expanding its energy drink offerings—a separate category from ready-to-drink coffees. *Id.* ¶ 4. In the spring of 2020, PepsiCo began developing an innovative energy drink offering a broader array of consumers more benefits than the typical energy drink, with a focus on morning consumption. *Id.* After spending months developing the product, name, and packaging, MTN DEW RISE ENERGY was officially launched nationwide on March 17, 2021. *Id.*

**B. MTN DEW RISE ENERGY is an innovative energy drink, with packaging that emphasizes its energy credentials, benefits, and MTN DEW heritage.**

PepsiCo's new MTN DEW RISE ENERGY beverage is a fruit-flavored energy drink differentiated from other energy drinks in several key ways. *Id.* ¶¶ 4-5. In addition to caffeine, a common ingredient across many beverages, it provides consumers with vitamins, immune-supporting ingredients such as zinc, juice, and citicoline (for mental boost). *Id.* ¶ 5. Its fruit-based flavors are sweet, and their names are consistent with other MTN DEW creative branding: Pomegranate Blue Burst, Tropical Sunrise, Strawberry Melon Spark, Peach Mango Dawn, Berry Blitz, and Orange Breeze, each with a different color to highlight the individual flavor. *Id.* ¶ 6.



The MTN DEW RISE ENERGY packaging signals its status in the energy drink category, with words, colors, and sizes that are typical of energy drinks and unlike typical ready-to-drink coffees. *Id.* ¶¶ 8-9, 11. The mark contains the word ENERGY directly on the can. *Id.* ¶ 11. By contrast, the names and labels on RBC's products (and, often other coffee-based drinks) contain words descriptive of coffee, like "Latte," "Coffee," and "Cold Brew." *Id.* MTN DEW RISE ENERGY is only sold in large 16-ounce cans—a standard size for energy drinks. *Id.* ¶ 9. RBC's coffees, however, are in smaller 7-ounce cans, typical for many ready-to-drink coffee drinks. *Id.* ¶ 11. The colors of the MTN DEW RISE



ENERGY packaging are bright and bold, often used in the energy drink category, and call out the fruit flavors to consumers.  *Id.* ¶¶ 8, 11.  This is distinguishable from brown or tan colors, which signal coffee, used by RBC and its competition in ready-to-drink coffees.  *Id.* ¶ 11.

The MTN DEW RISE ENERGY packaging also prominently highlights the unique benefits of the product line.  The top of each can states, in all caps, "Immune Support," the caffeine amount, and "Mental Boost."  *Id.* ¶ 9.  A side panel, underneath the MTN DEW RISE ENERGY mark, educates the consumer on key features of the drink:  the percentage of juice; zero grams of added sugar; zinc, vitamins A and C, and antioxidants; and a contextual framework for the amount of caffeine, *i.e.*, the explanation that the caffeine is equal to approximately two cups of coffee.[1]  *Id.* ¶¶ 9-10.



The MTN DEW RISE ENERGY packaging also emphasizes the MTN DEW connection.  *Id.* ¶ 13.  The MTN DEW brand—a distinct mark angled upward to the right—stands out near the top of the can, in bold letters, superimposed and locked-up with the term RISE and adjacent to ENERGY running vertically up its side, all forming a unique composite logo, which appears again on the side of the can.  *Id.*  The packaging prominently features a stylized lion composed of geometric shards that are frequently part of the MTN DEW brand graphics and trade dress.  *Id.* ¶ 14.

## C. MTN DEW RISE ENERGY is marketed as a MTN DEW energy drink—not a coffee replacement.

PepsiCo markets MTN DEW RISE ENERGY as a morning energy drink, building on the MTN DEW brand.  *Id.* ¶ 22.  Part of PepsiCo's marketing focuses on action sports participants

---

[1] Reference to the caffeine level of coffee is a common measure readily grasped by consumers.  Torres Decl. ¶ 10.  Beverage companies—including Coke and PepsiCo—use coffee as a baseline metric to help consumers understand the caffeine contents of their products.  *See* https://www.coca-colacompany.com/faqs/what-is-caffeine (last visited August 10, 2021); https://www.pepsicobeveragefacts.com/home/caffeine (last visited August 10, 2021).

(*e.g.*, surfers, skiers), who are key consumers of MTN DEW and energy drinks, as well as the X Games heritage long part of MTN DEW promotional efforts. *Id.* ¶ 23. PepsiCo's packaging and consumer marketing deliberately and consistently use the MTN DEW brand when referring to the product, not MTN DEW or RISE alone. *Id.* ¶ 22. PepsiCo's marketing intentionally does not suggest replacing coffee with MTN DEW RISE ENERGY. *Id.* ¶ 24.

Consistent with PepsiCo's marketing strategy, MTN DEW RISE ENERGY is sold as an energy drink. Declaration of Kathryn Walker ("Walker Decl.") ¶ 3. Consumers, retailers, and beverage industry professionals generally view energy drinks as its own category, distinct from the coffee and tea category. *Id.* MTN DEW RISE ENERGY is sold alongside other non-coffee-flavored energy drinks. *Id.* Ready-to-drink coffee drinks are typically sold in different sections and often different aisles. *Id.* PepsiCo has not offered and does not intend to offer a coffee or tea flavor for MTN DEW RISE ENERGY. Torres Decl. ¶ 24.

### D. PepsiCo developed MTN DEW RISE ENERGY independently.

PepsiCo did not copy RBC's branding or products. *Id.* ¶ 18. Rather, PepsiCo set out to create a unique, successful energy drink. *Id.* ¶ 15. Its use of "RISE" in MTN DEW RISE ENERGY has nothing to do with RBC. *Id.* ¶ 16. PepsiCo included the word "RISE" to connote morning-time and new beginnings as well as "rising up" and overcoming obstacles (*e.g.*, PepsiCo uses the phrase "Conquer the Morning" in advertising). *Id.* ¶ 15. The marketing team that came up with the mark was not aware of RBC or its products when creating, testing, and proposing MTN DEW RISE ENERGY. *Id.* ¶ 16. None of the PepsiCo people RBC identified by name in its motion had any involvement with MTN DEW RISE ENERGY; there simply is no connection between PepsiCo's decision to develop a new energy drink and RBC or its products. *Id.* ¶¶ 16-17.

The parties here are just two of many entities using the word "RISE" as part of a trademark. At least 18 other federal registered marks for coffees and teas contain the word "RISE"; at least

11 of these predate RBC's marks, and RBC allowed seven later third-party applications to register and coexist. *See* Declaration of Emily Pyclik ("Pyclik Decl.") ¶¶ 2 & 4, Ex. A (third-party Class 30 registrations). There are over 50 active third-party registrations or applications that include the term "RISE" for beverages and breakfast foods or snacks. *Id.* ¶¶ 2-4, Ex. A (third-party Class 30 registrations), Ex. B (third-party Class 32 registrations). One of these third-party marks is an allowed application by The Coca-Cola Company for DIET COKE RISE (which RBC did not oppose). *Id.* ¶ 4. Several of these, used in connection with soft drinks and energy drinks, both pre-date and coexist with RBC's marks, including RIZE, RISE AGAIN!, and ULTRA SUNRISE. *See id.*, Ex. B (third-party Class 32 registrations). Other registrations/applications abound: RISE and ALL RISE BREWING for beer, RISE UP for smoothies, and RISE. SHINE. REPEAT. for bottled water and sports drinks. *See id.*, Ex. B (third-party Class 32 registrations). In addition, dozens of marks with the word "RISE" exist that are used for coffee, coffee-related products and services, restaurants, and other beverages. *See id.*, Ex. D (list of third-party products). These numerous third-party uses and registrations demonstrate that consumers do not depend on the word "RISE" to identify source, but instead look at differences between the marks and/or products such that they are not confused. MTN DEW RISE ENERGY is as distinguishable from all these other marks as they are from each other, as "RISE" is extremely weak due to its extensive dilution.

E.     **RBC delayed for months before seeking relief, while PepsiCo went forward in good faith, with significant expense and success, and no evidence of confusion.**

Months ago, on January 11, 2021, RBC sent PepsiCo a demand letter from RBC's outside counsel asking that PepsiCo "abandon any intent" to use the mark "MTN DEW RISE ENERGY." Pyclik Decl., Ex. F (RBC letter) at 2. PepsiCo responded that it planned to go forward with use of the MTN DEW RISE ENERGY mark and provided to RBC samples of the planned packaging. *See* Pyclik Decl., Ex. G (PepsiCo's January 26, 2021 response). PepsiCo pointed out many reasons

why there is no conflict between MTN DEW RISE ENERGY and RBC's RISE BREWING CO. marks, including the pre-existing, widespread third-party use of RISE in other marks. *Id.*

RBC waited two months to reply to PepsiCo; by the time RBC responded on March 16, 2021, PepsiCo had shipped to retailers nationwide its MTN DEW RISE ENERGY branded energy drinks which already were on store shelves. Torres Decl. ¶ 4. PepsiCo never suggested that it would stop using its MTN DEW RISE ENERGY mark, yet RBC did not file suit until June 15, 2021—some three months after PepsiCo's nationwide launch—and even then did not seek any immediate relief.

PepsiCo meanwhile continued investing significant resources in the MTN DEW RISE ENERGY product line.[2] *Id.* ¶ 23. PepsiCo has spent millions of dollars in marketing the MTN DEW RISE ENERGY drinks, primarily focused on in-store placements for the product. *Id.* Since the launch in mid-March 2021, PepsiCo has shipped more than 34.8 million cans of MTN DEW RISE ENERGY. Walker Decl. ¶ 10. It is in more than 170,0000 stores nationwide. *Id.* ¶ 9.

During these many months of sales, no retail customers or consumers have reported any instances of confusion about the source or affiliation of MTN DEW RISE ENERGY drinks and RBC or its products; PepsiCo is unaware of any instance of actual consumer confusion. *Id.* ¶ 12; Torres Decl. ¶ 19. While RBC has no survey or other expert evidence to support its claims, the two survey experts who have conducted independent studies both conclude that there was and is

---

[2] RBC suggests that a bond in this case should be zero, ignoring the real harm an injunction would cause PepsiCo. "In setting the amount of security for a preliminary injunction, the trial court should err on the high side, since an error on the low side may produce irreparable injury, because damages for an erroneous preliminary injunction may not exceed the amount of the bond." *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 318 (S.D.N.Y. 2001) (quotations and citation omitted). No bond could correct the reputational harm and disruption that an injunction would cause, and PepsiCo believes the record shows that no injunction should issue. However, should the Court disagree, an evidentiary hearing on the amount of a bond should be held before an injunction issues. Indeed, in light of the nationwide market success of MTN DEW RISE ENERGY, any bond here would need to be at least $65,000,000, taking into account PepsiCo's lost sales, lost advertising costs, and lost inventory.

no evidence of confusion—either reverse or forward confusion.[3]  Johnson Decl.; Pittaoulis Decl.

Put simply, there is no evidence in the record of actual confusion or irreparable harm to RBC.

RBC could not be surprised by the absence of confusion in the market, as it previously had gone on record with the USPTO that consumers do not give weight to "RISE" as a product identifier.  Pyclik Decl., Ex. E (RBC office action response).  RBC's trademark application for RISE COFFEE CO. was initially rejected because the mark was likely to be confused with prior registrations for RISE UP, RISE UP ORGANIC COFFEE, and RISE UP COFFEE ROASTERS. *Id.*  To overcome the refusal, RBC admitted to the USPTO that "many entities have used the word 'Rise' . . . making it unlikely that consumers would give significant weight to this term in ascertaining the source of such goods" and that "[t]he fact that there are multiple Rise-formulated coffee marks owned by different registrants peacefully coexisting without confusion shows that there is room for another Rise-formulated mark."  *Id.*  RBC further stated that "third-party registrations serve as compelling evidence that *the shared term 'Rise' is extremely weak and diluted*, such that it creates *little source-identifying significance* that could contribute to any likelihood of confusion apart from the cited mark as a whole."  *Id.* (emphasis added).  The USPTO did not embrace RBC's argument (because RBC did not put in sufficient evidence), but RBC plainly staked out its position that "RISE" itself is weak and continued to use and register "RISE" marks.  Apparently, the USPTO has implicitly recognized this dilution by granting RBC's later applications.

## II.    ARGUMENT

Preliminary injunctions are "extraordinary and drastic" remedies that "should not be

---

[3] "The traditional pattern of classic 'forward confusion' occurs when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services. . . . In 'reverse confusion,' customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user."  4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed.).

granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation omitted). A party seeking a preliminary injunction must show (1) "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party" and (2) "irreparable harm." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "To demonstrate irreparable harm, the movant must show 'an injury that is neither remote nor speculative, but actual and imminent." *Engine Capital Mgmt., LP v. Engine No. 1 GP LLC*, No. 21 Civ. 149 (VM), 2021 WL 1372658, at *4 (S.D.N.Y. Apr. 12, 2021) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). RBC has not made that showing.

### A. RBC has not shown a likelihood of success on the merits.

"[T]o succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and . . . that the defendant's use of its own mark will likely cause confusion with plaintiff's mark." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993). RBC has not cleared those hurdles.

When assessing whether "consumers are likely to confuse the source of the parties' respective [products]," courts balance the eight *Polaroid* factors. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (affirming summary judgment that the marks DENTYNE ICE and ICE BREAKERS for gum were dissimilar and taking particular note of defendant's use of its house mark DENTYNE). The Second Circuit has "often stated that 'the evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* (internal quotation omitted).

"For a finding of infringement, a probability of confusion, not a mere possibility, must be

found to exist." *Gruner + Jahr*, 991 F.2d at 1077. The inquiry is whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of the defendant's mark." *Id.* The *Polaroid* factors show that RBC is unlikely to prove a likelihood of confusion due to PepsiCo's mark.

### i. There is no evidence of actual consumer confusion (*Polaroid* factor 5).

This factor strongly favors PepsiCo, as PepsiCo's survey evidence conclusively establishes there is no likelihood of confusion between the parties' marks. One of PepsiCo's survey experts tested reverse confusion and found *zero net confusion*—whether the marks at issue caused consumers to believe PepsiCo (the alleged junior user) was the source of or was associated with the claimed senior, RBC's coffee drinks. Johnson Decl. ¶¶ 10, 13. The other PepsiCo survey expert tested forward confusion—whether the marks at issue caused consumers to believe RBC (the alleged senior user) was the source of or was associated with the alleged junior, MTN DEW RISE ENERGY products, and found only 1.5% net confusion. Pittaoulis Decl. ¶ 10. As a matter of law, that shows no confusion at all: courts have found that confusion rates of fewer than 3% and even 7.84% show no confusion <u>as a matter of law</u>.[4]

In contrast to such compelling survey evidence, RBC has no cognizable evidence of consumer confusion. RBC submitted no survey evidence, which the Second Circuit has noted is "evidence that actual confusion cannot be shown." *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021) (unpublished) (affirming summary judgment against trademark

---

[4] *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (granting defendant's motion for summary and finding a "fewer than 3%" confusion rate insufficient to demonstrate a likelihood of confusion); *Cumberland Packing Corp. v. Monsanto Co.*, 140 F. Supp. 2d 241, 254 (E.D.N.Y. 2001) (granting defendant's motion for summary judgment and finding survey's confusion rate of 7.84% insufficient to raise material fact as to likelihood of consumer confusion); *cf. Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 321 (S.D.N.Y. 2000) (issuing declaratory judgment after bench trial of non-infringement where survey evidence showed "negligibly low (below 5%)" levels of confusion), *aff'd*, 234 F.3d 1262 (2d Cir. 2000).

holder where the plaintiff did not submit survey evidence or other cognizable evidence of actual confusion). Courts in this district have denied preliminary injunctions due to the lack of actual confusion when the plaintiff failed to present survey evidence. *See Engine Capital*, 2021 WL 1372658, at *8 (denying preliminary injunction request and stating that it was "significant" that plaintiff did not present a survey and instead relied on a handful of anecdotes). As one court explained in denying a preliminary injunction request, a plaintiff's "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown." *Essence Commc'ns, Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 269 (S.D.N.Y. 1988).

RBC's four anecdotes fail to carry its burden. As a court in this district recently explained in denying a preliminary injunction: a "handful of instances" is "insufficient to support a finding that widespread confusion is *likely* to occur." *Engine Capital*, 2021 WL 1372658, at *8 (citing cases affirming summary judgment for defendants where the plaintiff presented *de minimis* evidence of confusion).[5] The anecdotes also are insufficient because none involves any actual consumer confusion affecting a purchasing decision, making the anecdotes irrelevant: "the relevant confusion is that which affects the 'purchasing and selling of the goods or services in question.'" *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991). The anecdotes are further weakened because they depend on RBC's own employees' testimony rather than declarations from third parties.[6]

---

[5] *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1150 (10th Cir. 2013) (affirming the district court's conclusion that four instances of confusion are *de minimis*); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (affirming the district court's conclusion that two anecdotes of confusion were *de minimis* and citing cases); *see also Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978) (affirming district court's denial of a preliminary injunction and refusing to credit *de minimis* instances of actual confusion); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) (denying preliminary injunction, discounting plaintiff's *de minimis* evidence, and noting "there is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions").

[6] *See Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) (vacating a permanent injunction and concluding that trademark holder "failed to show actual confusion affecting purchasers" where it offered no testimony of any consumer nor any survey evidence and instead relied on the testimony of its own salespersons);

RBC's first anecdote did not involve PepsiCo's mark. RBC employee Rachel Ratliff claims to have been contacted on March 3, 2021 (before the launch of MTN DEW RISE ENERGY) by a Mariano's grocery store employee who allegedly believed that RBC's drinks were selected for an upcoming display, but who relied on Mariano's own document describing the selected product as "Rise Energy Singles." RBC's Ratliff Decl. (Dkt. 34) ¶ 7. There is no evidence that this employee had seen, much less was confused by the MTN DEW RISE ENERGY mark. There was also no confusion related to any purchasing decision. Nor was the employee confused about the source of RBC's products, so there was no reverse confusion, making this anecdote irrelevant. *See Lang*, 949 F.2d at 583 (affirming summary judgment for defendant in reverse confusion case and holding evidence of forward confusion irrelevant).

RBC's second anecdote does not involve confusion at all: RBC claims a shelf for RBC products at a single Walmart store was stocked with MTN DEW RISE ENERGY, which RBC claims was due to "confusion or malice" by a PepsiCo stocker. RBC's Memorandum in Support of its Preliminary Injunction Motion ("RBC's Memo.") (Dkt. 82) at 17. But RBC's own evidence shows there was neither confusion nor malice: rather, RBC's employee declares that the Walmart manager said "due to some low stock issues in functional beverage, [the manager] had notified beverage representatives that day that they could stock their products on the empty shelves to fill the space, rather than in their designated product areas." RBC's Guidi Decl. (Dkt. 28) ¶ 6. That is no evidence of any type of confusion.

RBC's third anecdote also shows no actual confusion: it is an email to an RBC employee from an "industry contact" holding a can of MTN DEW RISE ENERGY, with the words, "This is

---

*Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 478 (3d Cir. 2005) (affirming denial of preliminary injunction and refusing to credit *de minimis*, anecdotal evidence "because it was based on [trademark holder's CEO's] deposition testimony rather than anything [the allegedly confused third party] testified to").

super confusing. I see coffee on here and Rise. Is this new?" RBC's Exhibit A of Melissa Kalimov's Decl. (Dkt. 31-1) at 3. But this "industry contact" does not claim to be confused himself, nor did he ask if the product was an RBC product. His LinkedIn page is telling. It claims that "Beverage and snack is my passion" and that he works for "independent brands"; other online information suggests that RBC is his client.[7] It is not credible for RBC to suggest that this person with experience in the industry believed that RBC had released a product under the MTN DEW brand. Plus, this anecdote does not show any reverse confusion or confusion affecting a purchasing decision.

RBC's last anecdote does not involve PepsiCo's mark or consumer confusion. RBC's employee claims that when she asked a Publix manager "if there was any more RISE in the backroom" (not using any RBC trademark or brand name nor showing the manager any RBC product), the manager asked "Mountain Dew RISE?" RBC's Kaye Decl. (Dkt. 32) ¶ 3. After the RBC employee held up a can of RBC coffee to show the manager, the manager apparently was not confused; RBC admits that its employee's "reference to our product as just 'Rise'" "had confused [the manager]." *Id.* This exchange is no evidence of trademark confusion.

> ii. **RBC's marks are weak, making it unlikely to prevail.**
>
>> 1. **The weakness of RBC's marks shows no likelihood of confusion (*Polaroid* factor 1).[8]**

Because RBC's marks are weak trademarks (*i.e.*, source-identifiers), this factor favors PepsiCo. *See Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983); (affirming

---

[7] *See* https://www.linkedin.com/in/brandonjlutz/ (last visited August 10, 2021); https://www.alignable.com/culver-city-ca/foundry-brand-services-group (last visited August 10, 2021).

[8] While RBC argues the strength of PepsiCo's mark matters for this factor, in reverse confusion cases, the Second Circuit analyzes the strength of a senior user's mark for determining whether there is a likelihood of reverse confusion. *See, e.g.*, *Lang*, 949 F.2d at 581; *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983).

denial of preliminary injunction in reverse confusion case where the plaintiff's mark was weak).[9]

When assessing likelihood of confusion, the strength of the asserted mark is one of the crucial factors. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 668 (S.D.N.Y. 2018). "Ultimately, the strength of the mark turns on its 'origin indicating' quality, in the eyes of the purchasing public." *Lang*, 949 F.2d at 581. "[W]here the plaintiff's mark is not associated with any particular source, defendant's use of a similar mark is unlikely to generate confusion." *LVL XIII Brands*, 209 F. Supp. 3d at 668.

Here, particularly since RBC relies primarily on the word "RISE," it cannot escape the reality that including "RISE" in a mark is not a strong source identifier. As the Second Circuit explained in *Plus Products*, when a mark is "comprised of an undistinctive word" and "coexist[s] with extensive third-party usage—it is extremely unlikely that prudent consumers will confuse it with similar marks on non-competitive goods." 722 F.2d at 1006. RBC has admitted this to the USPTO.[10] *See* Pyclik Decl., Ex. E (RBC Office Action Response). RBC is saddled with that admission and cannot now change course. As the Third Circuit explained in a similar case,

> Whether we view the district court's treatment of [trademark holder's] prior representations about the commercial availability of marks containing the word 'freedom' as judicial estoppel, an admission, waiver, or simply hoisting [trademark holder] by its own petard, we agree with the district court's conclusion . . . . [The trademark holder's] own statements and actions, together with Chase's undisputed evidence of the widespread and common use of 'freedom,' undermine [trademark holder's] belated attempt to establish likelihood of confusion from the juxtaposition of 'freedom' and Chase's housemark.

---

[9] The strength of a mark is determined by two factors: (1) the mark's classification; and (2) the degree to which the mark is recognized in the marketplace. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384–85 (2d Cir. 2005). "Marks are classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *Id.* After a mark is classified, the second inquiry concerns both the "inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question." *Id.*

[10] *See Alpha Media Grp., Inc. v. Corad Healthcare, Inc.*, No. 13 Civ. 5438 (WHP), 2013 WL 5912227, at *3 n.1 (S.D.N.Y. Nov. 4, 2013) (acknowledging that statements to the USPTO may be considered evidence of "the truth of the assertions").

*Freedom Card, Inc.*, 432 F.3d at 476.

Third parties continue to use and register "RISE" marks on coffees and other goods. That extensive third-party use, which RBC's alleged policing has not overcome, demonstrates that RBC's marks are weak. *See* § I(E), *supra*. In a similar case, the Second Circuit found that confusion was "extremely unlikely" when a plaintiff "tacitly acknowledged the weakness of [its] mark," and there was "extensive" third-party use. *Plus Prods.*, 722 F.2d at 1005–06; *see also Freedom Card, Inc.*, 432 F.3d at 476 (trademark holder's own prior statements to the USPTO that "Freedom Card" and "Fuel Freedom Card" were unlikely to cause confusion due to "numerous" other "freedom" marks co-existing in the bank card market undermined its attempt to claim likelihood of confusion).

Considering the universe of marks using the word "RISE," RBC's claimed marks for coffee drinks are not strong enough to prevent use of MTN DEW RISE ENERGY on a different product category like energy drinks, particularly in view of the differences between the marks. *See Lang*, 949 F.2d at 581 ("[E]xtensive third party use of the words 'Choice' and 'Choices' weighs against a finding that Lang's trade name is strong.").[11] Here, MTN DEW RISE ENERGY is at least as distinguishable from RBC's marks as are numerous other third parties' marks.

The strength of PepsiCo's MTN DEW RISE ENERGY mark also weighs against any confusion, especially since the marks are not identical. *See* § II(A)(iii), *infra*. There is no evidence that consumers are likely to believe a product with the mark RISE BREWING CO., with no trace of anything resembling MTN DEW, is associated with PepsiCo.

---

[11] *See Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015) (vacating the Board's decision that there was a likelihood of confusion because the Board failed to give adequate consideration to the strength or weakness of the mark, and stating that evidence of substantial third-party registrations is evidence of the descriptive or highly suggestive nature of a mark).

## 2. RBC has not shown a likelihood that its asserted common-law marks are entitled to protection.

Not only are RBC's alleged registered and common-law marks weak, but RBC has also failed to establish its purported common-law trademarks, including "RISE" per se, are entitled to protection, thus failing to satisfy both prongs of the trademark infringement inquiry.[12] Indeed, RBC's newfound allegation that it has a common-law trademark for "RISE" can be dismissed out of hand: RBC failed to plead that it possessed a common-law trademark for the word "RISE," which alone dooms any request for relief based on that term. *See Multi-Vet Ltd. v. Premier Pet Prod., Inc.*, No. 08-CV-3251 (LMM), 2008 WL 3914845, at *6 (S.D.N.Y. Aug. 22, 2008) (denying a preliminary injunction because unpleaded trademark rights could not "form the basis for relief").

Nor has RBC satisfied its burden for its purported common-law marks. It must show use in commerce that is deliberate and continuous—not sporadic, casual, or transitory. *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271–72 (2d Cir. 1974). RBC provided no evidence of continuous trademark use in commerce and no purported dates of use except for the marks on its coffee cans (RISE COFFEE and RISE NITRO BREWING CO.);[13] nor is there evidence that RBC was the first to use these marks. *See* Gyesky Decl. (Dkt. 29) ¶¶ 4-13. Moreover, RBC does not have exclusive rights to any one word within its composite marks, especially when that word, RISE, is commonly used by multiple other parties for similar, if not

---

[12] *See, e.g.*, *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 75, 84 (2d Cir. 2020) (noting that registered marks presumptively satisfy the "entitled to protection" prong of the inquiry). Discovery, however, may reveal that RBC abandoned its registered RISE BREWING CO. mark, as RBC provides no explanation for its decision to stop using the mark in January 2019 or why it purportedly resumed use in January 2021. *See* Gyesky Decl. (Dkt. 29) ¶¶ 9-11.

[13] RBC's attempts to show use of the word "RISE" standing alone do not pass legal muster. It cannot rely on its coffee kegs, which do not even use the word "RISE" standing alone but instead say RISE COFFEE NYC. *See Kate Spade LLC v. Saturdays Surf LLC*, 950 F. Supp. 2d 639, 643 (S.D.N.Y. 2013) (rejecting claim that company owned a common-law trademark in the word Saturdays where the evidence showed only use of the longer mark Saturdays Surf NYC). Nor did RBC provide any evidence showing sales of those kegs. Similarly, RBC's reliance on website screenshots, with no evidence of any point of sale or dates of usage, does not satisfy its burden. *See, e.g., Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (holding that "mere advertising" did "not constitute 'use' of the mark within the meaning of the Lanham Act").

identical, goods. *See* Pyclik Decl. ¶¶ 2-4, Exs. A-D (showing third-party usage). RBC's proof of alleged common-law marks fails.

### iii. The parties' marks are not confusingly similar (*Polaroid* factor 2).

RBC's Rise Brewing Co. marks and PepsiCo's MTN DEW RISE ENERGY mark are different and create distinct commercial impressions. PepsiCo's famous MTN DEW brand is distinctive, and there are clear differences in the words, colors, typeface, can shape and size, and logos. In determining whether similarities in the marks are likely to provoke consumer confusion, "a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." *Lang*, 949 F.2d at 581. Where the marks are sufficiently dissimilar, courts render judgment against the trademark holder on this factor alone. *See Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166–67 (2d Cir. 2004) (affirming summary judgment and noting that "[i]n an appropriate case, the similarity-of-marks factor may alone be dispositive"), *superseded on other grounds by statute*. This factor weighs strongly against a likelihood of confusion.

Moreover, the marks themselves—including RISE BREWING CO. and MTN DEW RISE ENERGY—are significantly different and convey different commercial impressions. The Second Circuit's analysis of the marks DENTYNE ICE and ICE BREAKERS for gum in *Nabisco* is instructive. There, the court noted that the marks were "at best marginally similar because of the common use of 'Ice.'" 220 F.3d at 46. As the court explained, "the varying placement of 'Ice' is a major difference," *id.* Similarly, the word "Rise" appears at the beginning of RBC's mark and in the middle of PepsiCo's MTN DEW RISE ENERGY.[14] The *Nabisco* court also relied on use of a house mark, noting that the defendant "prominently—indeed primarily—identifies

---

[14] This case, which RBC does not cite, is irreconcilable with RBC's repeated claim that the marks at issue in this case are "identical." RBC's Memo. (Dkt. 82) at 1, 2, 11, 14.

DENTYNE ICE as a member of the DENTYNE family of gums, a brand that Nabisco concedes is widely recognized by the consuming public." *Id.* Here, too, PepsiCo prominently and primarily identifies MTN DEW RISE ENERGY as a member of the MTN DEW family, and RBC concedes this brand's wide recognition. *See* RBC's Memo. (Dkt. 82) at 13. By contrast, RBC's mark does not and cannot include MTN DEW. The Second Circuit's conclusion that the defendant's "prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products" applies equally here. *Nabisco*, 220 F.3d at 46. Confusion is unlikely.

RBC is mistaken in contending that PepsiCo's use of its famous MTN DEW brand makes confusion more likely. The Second Circuit recognized that cases have been in conflict about whether a strong trade name aggravates confusion and resolved the tension by holding that "where the junior and senior marks are not identical, the presence of a trade name will tend to militate *against* a finding of confusion." *Playtex*, 390 F.3d at 165. Indeed, the Second Circuit affirmed judgment as a matter of law against the trademark holder in a reverse confusion case, where the plaintiff sold "Sportstick" lip balm and the defendant sold "Right Guard Sport Stick"; even though both marks used the words "sport" and "stick" in connection with personal care products, the court explained that "when a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993); *see also Mejia and Assocs., Inc. v. Int'l Bus. Machines Corp.*, 920 F. Supp. 540, 547 (S.D.N.Y. 1996) (finding in a reverse confusion case that the defendant's use of its brand name "heavily undercuts the contention that the marks are confusingly similar").

RBC's assertion that the "marks are identical" is factually wrong and its invitation to the Court to focus on the word "Rise" alone is legally wrong. "[M]arks are not 'similar' for purposes

of assessing likelihood of confusion simply because they contain an identical or nearly identical word." *Mejia*, 920 F. Supp. at 547 (granting summary judgment against trademark holder). "The commercial impression of a trademark is derived from it as a whole, not from its elements separated and considered in detail. For this reason it should be considered in its entirety." *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920). The inclusion of common words as a "focal point" is not alone sufficient to even create a triable issue of fact on the likelihood of confusion, much less to prevail. *See Lang*, 949 F.2d at 581 (affirming summary judgment where both marks had the same "focal point" of "New Choices" because the marks were not confusingly similar, in part because of the defendant's use of additional words and a different typeface).

A visual analysis of RBC's and PepsiCo's marks and the contexts within which those marks are presented confirms that the marks are not confusingly similar. The typeface on the products, the different color schemes, the different product types, the distinct product profiles and size (16 ounces versus 7 ounces), and the divergent images (the sun on RBC's product connoting sunrise, the lion on MTN DEW RISE ENERGY conveying power to overcome) create vastly different commercial impressions and connotations.

These types of differences are sufficient to end a plaintiff's case. In the *Nabisco* case, where the defendant's "prominent use of its DENTYNE house mark significantly reduces, if not altogether eliminates, any likelihood of consumer confusion," the court held that the different typefaces, different dimensions (although both products were rectangular), different shades and patterns (although both products used blue and white), and different wrapping and forms "suffice to dispel completely any residual confusion." 220 F.3d at 47–48; *see also Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (affirming dismissal of trademark infringement

claims where two marks were not confusingly similar because the context was different, having different logos, dress colors, and typefaces).[15]  Here, the differences of the marks manifests that consumer confusion is unlikely, as confirmed by PepsiCo's survey evidence.

### iv.    The parties' products are different (*Polaroid* factor 3).

The products sold under the parties' respective marks are different:  RBC sells coffee and tea drinks, while PepsiCo sells MTN DEW RISE ENERGY as a fruit-flavored energy drink with an innovative formula (which, contrary to RBC's allegations, PepsiCo does not market as a "coffee replacement," *see* RBC's Memo. (Dkt. 82) at 15).  Torres Decl. ¶ 24.  That these are different drinks, in different beverage categories, weighs against a likelihood of confusion.  *See Swedish Beer Export Co. Aktiebolag v. Canada Dry Corp.*, 469 F.2d 1096, 1097 (C.C.P.A. 1972) (affirming trademark registration for SKOLA for soft drinks, despite existing SKOL for beer trademark, because "soft drinks and beer are goods whose differences are clearly recognized by would-be purchasers").  The products are in different categories and marketed in different sections in the store (energy versus coffee and tea), which also weighs against confusion.  *See* Walker Decl. ¶¶ 3, 5-7; *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981) (noting that cookies and crackers were sold in different sections and affirming district court's finding that there was no likelihood of confusion); *see also Plus Prods.*, 722 F.2d at 1008 (noting that "segregation" of goods in grocery stores weighed against confusion).

### v.    PepsiCo adopted its mark in good faith (*Polaroid* factor 6).

PepsiCo adopted its MTN DEW RISE ENERGY mark in good faith, with no intention to trade on the goodwill or reputation of RBC.  Torres Decl. ¶ 18.  Because "it is unlikely that a larger and better-known junior user intends to trade on the reputation of the lesser-known plaintiff," this

---

[15] As another example, in *Lapine v. Seinfeld*, 375 F. App'x 81 (2d Cir. 2010), the Second Circuit, affirming summary judgment for defendant, concluded that the "dissimilarity of the marks is dispositive."  *Id.* at 84.

factor is "therefore less relevant in a reverse confusion inquiry." *First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc.*, No. 02-CV-3691 (DLC), 2004 WL 1575396, at \*12 (S.D.N.Y. July 15, 2004). Contrary to RBC's contentions, no one involved in the development of MTN DEW RISE ENERGY had any interaction with RBC, and there is no evidence of any intent to cause any form of confusion. *See Freedom Card, Inc.*, 432 F.3d at 480 (alleged contact with employees of trademark holder did not raise fact issue on intent where the allegedly communicating employees "had no involvement in the development" of the accused product). Further, mere knowledge of a mark is not itself sufficient to show bad faith. *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995) ("Prior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith."). Nor was it bad faith for PepsiCo to refuse to comply with a cease-and-desist letter, especially in light of PepsiCo's detailed explanation of its position (and alignment with RBC's position before the USPTO as to third-party use and weakness of the word "Rise" as a mark). *See O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008) ("a defendant's refusal to abandon a mark in the face of a cease and desist letter cannot demonstrate bad faith standing alone"). This factor favors PepsiCo.

### vi. There is no evidence RBC will "bridge the gap" and sell energy drinks (*Polaroid* factor 4).

With no evidence that prospective purchasers believe that RBC would begin selling energy drinks, this factor weighs against RBC. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) ("'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."). RBC is wrong that "there is no gap to bridge." RBC's Memo. (Dkt. 82) at 15. RBC has not shown that a consumer would expect a coffee "brewing company" to begin selling non-brewed energy

drinks. RBC has no evidence of plans to sell an energy drink and PepsiCo does not market or sell coffee-based beverages under the mark MTN DEW RISE ENERGY. The divergent nature of the products supports the absence of any likelihood of confusion.[16] *See Buitono Foods Corp. v. Gio Buton & C. S.p.A.*, 680 F.2d 290, 292–93 (2d Cir. 1982) (bridging the gap factor weighed against likelihood of confusion, finding only "slight proximity" because the different wines at issue "differ[ed] in ways that may be deemed material to consumers").

### vii. PepsiCo's MTN DEW RISE ENERGY drinks are at least equal in quality to RBC's products (*Polaroid* factor 7).

There is no evidence that PepsiCo's products are of inferior quality or that RBC's reputation "could be tarnished" by the quality of PepsiCo's products; this factor does not support RBC. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) (finding this factor "lends no support to plaintiff's claim" when plaintiff "produced no evidence of inferior quality"). MTN DEW RISE ENERGY has been commercially successful. *See* Walker Decl. ¶ 9. RBC's reliance on a single person's commentary (which itself is not particularly negative) and unsupported speculation about consumer preference for organic ingredients is insufficient.

### viii. RBC put in no evidence on consumer sophistication (*Polaroid* factor 8).

RBC put in no evidence on this factor, relying only on case law generally about the low price of the products. But "price alone is not determinative of the care a consumer will take in making purchases, and [the] touchstone remains the general impression that is left with the ordinary consumer." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 119 (2d Cir. 2009). Where, as here, the plaintiff does not provide evidence of consumer sophistication, the Second Circuit "decline[s] to give this factor much, if any, weight in [its] *de novo* balancing of the

---

[16] While this factor weighs against an injunction, even in cases where there is "no gap to bridge," this factor then becomes simply "irrelevant to the *Polaroid* analysis." *Star Indus.*, 412 F.3d at 387 (treating this factor as neutral where both parties used marks on liquor bottle labels).

*Polaroid* factors." *Id.* (concluding there was no likelihood of confusion between Starbucks and Charbucks coffee marks) (internal quotation omitted). This factor does not support RBC's claims.

### B. RBC shows neither serious questions on the merits nor a balance of hardships tipping decidedly in its favor.

RBC has not shown serious questions on the merits: confusion is not likely. This alone is dispositive of RBC's motion. But RBC also did not show a balance of hardships tipping decidedly in its favor—a required element even where the plaintiff does show serious merit questions. The balance of hardship favors PepsiCo, and RBC's motion fails because it has no evidence of irreparable harm—an independent requirement for injunctive relief.

### i. RBC has no evidence of harm from PepsiCo's sales of MTN DEW RISE ENERGY, much less irreparable harm.

Because there is no likelihood of confusion, RBC is not entitled to the rebuttable presumption of irreparable harm. 15 U.S.C. § 1116(a). RBC's delay—waiting over five months to file suit and another two weeks to request a preliminary injunction—reveals no pressing need for extraordinary relief. This delay rebuts any presumption of irreparable harm. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967–68 (2d Cir. 1995) (the "presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief").[17] Courts in this district routinely hold that similar delays refute irreparable injury.[18] RBC has known since January that PepsiCo would go forward with its MTN

---

[17] While this opinion predates the Trademark Modernization Act, its holding is still applicable, as this presumption is like the current statutory presumption. *Compare Tough Traveler*, 60 F.3d at 967 ("When a plaintiff has shown a 'high probability of confusion,' there is normally a presumption of irreparable harm."), *with* 15 U.S.C. § 1116(a) ("A plaintiff seeking [a preliminary] injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits.").

[18] *See, e.g.*, *Cheng v. Dispeker*, No. 94-CV-8716 (LLS), 1995 WL 86353, *5–*6 (S.D.N.Y. Mar. 2, 1995) (denying preliminary injunction because five-month delay "vitiates plaintiffs' assertion that they will be irreparably harmed if a preliminary injunction is not entered"); *Citigroup Inc. v. AT&T Servs., Inc.*, No. 16-CV-4333 (KBF), 2016 WL 4362206, at *5 (S.D.N.Y. Aug. 11, 2016) (denying preliminary injunction where three-month delay undercut irreparable harm); *Le Cordon Bleu S.a.r.l. v. BPC Pub. Ltd.*, 327 F. Supp. 267, 270–71 (S.D.N.Y. 1971) (13-week delay sufficient to bar preliminary injunction where defendant spent over $1 million during that time).

DEW RISE ENERGY product; yet RBC delayed, undermining its claim of imminent irreparable injury.[19]

Moreover, RBC did not provide any *evidence* of actual harm. RBC relies only on speculation about investor concerns, which is at odds with its claims of market success; this is insufficient. *See* RBC's Memo. (Dkt. 82) at 23 (raising unsubstantiated claims about hypothetical investors); *Grand River Enter. Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (affirming denial of preliminary injunction where plaintiff did not prove an inability to receive a loan). RBC has not provided any concrete evidence of funding constraints or financial instability, much less evidence that PepsiCo is to blame. Nor does RBC provide any *evidence* of harm to its brand; its conclusory speculation is insufficient to show irreparable harm. "[C]onclusory statements of loss of reputation will not justify an irreparable harm finding." *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10 Civ. 3314 (RWS), 2015 WL 4033019, at *11 (S.D.N.Y. June 29, 2015).[20] RBC's motion should be denied on this ground alone.

### ii. An injunction would cause significant, irreparable harm to PepsiCo.

The harms to PepsiCo include the significant costs of stopping the sales, distribution, and marketing of this nationwide product, lost sales, costs of re-branding, plus unquantifiable losses to PepsiCo's reputation and goodwill. *See* Walker Decl. ¶¶ 13-14; Torres Decl. ¶ 27. These very

---

[19] *See Cheng*, 1995 WL 86353, at *6 (denying preliminary injunction for unexplained delay when, after receiving an "unequivocal response" from defendant, "plaintiffs were aware of the extent of the infringement and did not need to investigate further before filing suit"); *Citigroup Inc.*, 2016 WL 4362206, at *5 (denying preliminary injunction for delay because "nothing in the record [] suggests that [defendant] ever gave [plaintiff] comfort that it would not use the name"); *27-24 Tavern Corp. v. Dutch Kills Centraal*, No. 14-CV-1625-FB-RER, 2015 WL 5772158, at *21 (E.D.N.Y. Sept. 29, 2015) (denying motion where plaintiff failed to show "more than the mere possibility" of harm or explain "why it delayed filing this application for four months after it issued its cease and desist letter, and then waited another month to file the instant action").

[20] *See also Engine Capital*, 2021 WL 1372658, at *12 (concluding that record did not support finding of irreparable harm because the plaintiff "only supplied a handful of affidavits" that lacked evidence of detrimental effects from purported confusion).

types of harm lead courts to refuse to preliminarily enjoin a product already in the market.[21]

With no evidence of harm to RBC, the balance of hardships favors PepsiCo. *See Downloadcard, Inc. v. Universal Music Grp., Inc.*, No. 02 Civ. 7710 (CSH), 2002 WL 31662924, at *5 (S.D.N.Y. Nov. 26, 2002) (denying motion that "would cause significant expense, marketing disruption, and commercial embarrassment, in part impossible to quantify, to defendant" where the hardship to plaintiff was speculative); *Long Island-Airports Limousine Serv. Corp. v. New York Airport Servs. Corp.*, 641 F. Supp. 1005, 1012 (E.D.N.Y. 1986) (denying motion where plaintiff's injury was "speculative" and defendant would have to re-brand).[22] With RBC failing to show confusion or harm, PepsiCo should not be forced to incur immense costs—nor consumers deprived of a well-liked, innovative product—prior to a trial on the merits. Walker Decl. ¶¶ 9-10.

## CONCLUSION

RBC is not likely to prevail on its trademark infringement claim. Nor has it shown a likelihood of imminent irreparable harm, particularly in view of its months of delay. RBC's Motion for Preliminary Injunction should be denied. But at the very least, and as a matter of law, the substantial factual disputes set forth here preclude RBC from establishing any entitlement to such relief without an opportunity for PepsiCo to take discovery and a full evidentiary hearing.

---

[21] *See, e.g.*, *Dutch Kills Centraal*, 2015 WL 5772158, at *21 (denying motion where defendant would be forced to "chang[e] the signage and rebrand[] the business" while plaintiff "ha[d] not shown that its sales or reputation ha[d] suffered since [defendant] opened for business"); *Pan Am. World Airways, Inc. v. Flight 001, Inc.*, No. 06-CV-14442 (CSH), 2007 WL 2040588, at *20 (S.D.N.Y. July 13, 2007) (balance of hardships "weigh[ed] heavily" in defendant's favor where defendant would have to change its signage and website and would lose the goodwill it had developed in the market); *Ivoclar N. Am., Inc. v. Dentsply Int'l, Inc.*, 41 F. Supp. 2d 274, 283 (S.D.N.Y. 1998) (denying motion where defendant "[stood] to lose several million dollars in estimated sales," would have to incur hundreds of thousands to "reintroduce" an already-introduced product, and would spend half a year preparing the product for distribution "with a new name").

[22] In all three cases RBC cites—unlike here where issuing an injunction would take PepsiCo's products off the shelves—the courts' decisions maintained the status quo through trial. *See Coastal Distribution, LLC v. Town of Babylon*, No. 05-CV-2032 (JS) (ETB), 2005 U.S. Dist. LEXIS 40795, at *62 (E.D.N.Y. July 15, 2005); *3BA Int'l LLC v. Lubahn*, No. 10-CV-829 (RAJ), 2010 WL 2105129, at *2–*4 (W.D. Wash. May 20, 2010); *Alacritech, Inc. v. Microsoft Corp.*, No. 04-CV-03284 (JSW), 2005 WL 850729, at *7–*8 (N.D. Cal. Apr. 12, 2005).

Dated:  August 10, 2021

Respectfully submitted,

BAKER BOTTS L.L.P.

*/s/ Timothy S. Durst*

Timothy S. Durst (*admitted pro hac vice*)
Paul J. Reilly
Susan Cannon Kennedy (*admitted pro hac vice*)
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:  +1.214.953.6500
Facsimile:  +1.214.953.6503
tim.durst@bakerbotts.com
paul.reilly@bakerbotts.com
susan.kennedy@bakerbotts.com

**ATTORNEYS FOR DEFENDANT
PEPSICO, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of August 2021, a true and correct copy of DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION was filed with the Clerk of the Court, Southern District of New York, and will be sent via email and electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ *Timothy S. Durst*</u>
Timothy S. Durst