IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RISEANDSHINE CORPORATION,

        Plaintiff,

vs.

PEPSICO, INC.

        Defendant.

CASE NO.: 1:21-cv-06324-LGS

**<u>DECLARATION OF LEON KAPLAN</u>**

## Qualifications[1]

1. I am the President of the Princeton Research & Consulting Center, LLC (PRCC), located in Lawrence, New Jersey.  PRCC is a survey-research organization specializing in marketing research and intellectual-property-litigation research.  It was founded by me in 1979.  Prior to founding PRCC, from 1975 to 1979, I was a Vice President in the Custom Research Group at Opinion Research Corporation, Inc.  From 1971 to 1975 I was a Senior Research Psychologist in the Advertising Department of the DuPont Company.

2. I have been involved in intellectual property research since 1982.  Starting in 1988, I conducted research for several testifying experts who were full-time academics and did not have the capability to implement the research they designed.  I still do that, although for the last few years my primary work has been in designing and conducting primary research directly for law firms.

3. I have been involved in over one hundred IP studies measuring the likelihood of confusion concerning both trademarks and trade dress, secondary meaning, advertising substantiation, deceptive advertising, claim substantiation, genericism, dilution, fame, class action and damages estimation.  None of the studies that I designed and conducted have ever been rejected by a court.  Neither has my testimony ever been rejected by a court.

4. I received my Ph.D. in Consumer/Industrial Psychology, with a Minor in Social Research Methods from Purdue University in 1971.  I was a Post-Doctoral Research Consultant with the Consumer Research Institute in Washington, D.C. in

---

[1] A copy of my CV and list of recent cases are in Exhibit A.

1971.  I also received an M.B.A. from The Wharton School, University of Pennsylvania, in 1979.

5.      I was a Guest Lecturer at the School of Business of Montclair State University, Upper Montclair, New Jersey.  I lectured about surveys for litigation and advanced research methods.  From 1971 to 1975 I was an Adjunct Faculty member at the Graduate School of Business of the University of Delaware.  I taught Consumer Behavior, Marketing Research, and Industrial Psychology.  In graduate school, I was a Teaching Assistant in the Department of Psychology.  At different times I taught Consumer Psychology, Industrial Psychology, and Educational Psychology.

6.      I am a member of the American Psychological Association and I am a member of the American Psychology-Law Society.  In addition, I am a member of the American Psychological Society and the Marketing Research Association.  I have published and presented papers, and have been a reviewer for a journal and two professional associations.

## The Present Matter

7.      In August of this year, counsel for RiseandShine Corp. d/b/a Rise Brewing contacted me about evaluating a likelihood of forward confusion study conducted by Dr. Melissa Pittaoulis and a reverse confusion study conducted by Mr. Phillip Johnson.  Both studies were conducted for PepsiCo.

8.      After reviewing the expert reports submitted by PepsiCo it is my expert opinion, based on my review of the materials and my nearly 35 years of experience conducting studies that measure confusion, that the surveys conducted by PepsiCo's

2

experts are fundamentally flawed and should not be relied upon by the Court. The basis for my opinion is set forth below.

9.  I am being compensated for this analysis and report at my normal rate of $750/hr plus expenses. My compensation is in no way contingent upon the nature of my findings or conclusions or the outcome of this case. Any findings or conclusions developed or reached by me in connection with this report reflect my own independent, professional judgment.

## A Framework for Evaluating a Survey for Litigation

10. There are general guidelines for conducting surveys for use in litigation and specifically for likelihood of confusion. Guidance is also available from decisions in key cases involving surveys. The guidelines and case law provide a framework for evaluating research.

11. In preparing this report, I relied on the following guidelines, publications, and materials related to this matter:

- Manual for Complex Litigation, 4th, Federal Judicial Center, 2004.
- J.Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, 4th, 2008.
- S. Diamond, Reference Guide on Survey Research in Reference Manual on Scientific Evidence, 3rd, Federal Judicial Center, 2011.
- S. Diamond & J. Swann (Eds.), Trademark and Deceptive Advertising Surveys: Law, Science, and Design (1st ed.), 2012. American Bar Association.
- First Amended Complaint RISEANDSHINE CORPORATION d/b/a RISE BREWING vs. PEPSICO, INC. Case 1:21-cv-06324-LGS Filed 07/26/21
- Plaintiff's Memorandum of Law in Support of its Motion for Preliminary Injunction Case 1:21-cv-06324-LGS Filed 07/26/21.
- Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction Case 1:21-cv-06324-LGS Filed 08/10/21.
- Expert Report and Exhibits A-1 through A-7 of Melissa Pittaoulis, Ph.D. August 9, 2021.

- Report and Exhibits A-1 and A-2 of Philip Johnson, RiseandShine Corp. d/b/a Rise Brewing vs. PepsiCo, Inc. A Study of Likelihood of Reverse Confusion. August 2021.
- Declaration of Allison Schmidt, August 24, 2021.
- Declaration of Alex Tenev, August 24, 2021.

I also relied on my own relevant education and experience.

### *PepsiCo's Forward Confusion Study Is Irrelevant*

12. Dr. Pittaoulis conducted a forward confusion study. Rise Brewing's Motion for Preliminary Injunction is based on a claim of reverse confusion. I have no knowledge of a forward confusion study being accepted to refute a claim of reverse confusion. Therefore, it is my opinion that Dr. Pittaoulis' forward confusion study is addressing an issue that is not relevant to the Motion for Preliminary Injunction and therefore is fatally flawed and of no value. I say this without offering an opinion on anything else about the study (e.g., the questionnaire, analyses, conclusions, etc.), which I did not evaluate because of the foundational flaws in Dr. Pittaoulis' survey.

### *PepsiCo's Reverse Confusion Study used the Wrong Methodology*

13. Mr. Johnson's study was a likelihood of reverse confusion (reverse confusion) study. It attempted to determine if entry into the market by the junior user, PepsiCo's Mtn Dew RISE ENERGY drinks, was likely to cause reverse confusion between it and the senior user, Rise Brewing's RISE-branded ready-to-drink coffee beverages, because they both use the name RISE.

14.     The study design used by Mr. Johnson is called an *Eveready* Design.[2]  It is one of the two most frequently used approaches to study likelihood of confusion, the other being the *Squirtco* Design[3].

15.     In an *Eveready* reverse confusion study design, the consumer is shown the senior user's mark and asked a series of questions designed to elicit confusion, if it exists.  In a *Squirtco* reverse confusion study design, the consumer is initially shown the senior user's mark.  The senior user's mark is then removed and the respondent is shown an array of competitive products, including the junior user's product.

16.     The two study designs are clearly quite different.  The choice of likelihood-of-confusion study design, whether it be an *Eveready* design or a *Squirtco* design is driven by two considerations – awareness of the senior user's mark in the relevant marketplace (how well known the mark is), and how proximate the plaintiff's and defendants products are in the marketplace (how close in time or space the two marks may be encountered).

17.     There are two kinds of awareness.  Aided awareness, also known as recognition, is when consumers need to be prompted by a name to acknowledge awareness of it.  It is what you get when you ask a consumer "Have you ever heard of MARK?"  Unaided awareness, or top-of-mind, awareness is when consumers can name something without being prompted by being given its name.  It is what you get when you ask a consumer "Tell me all the brand names of PRODUCT you can think of."

18.     Mr. Johnson provides a meager and inaccurate rationale for using an *Eveready* design, as opposed to an alternative design, to test reverse confusion.  All he

---

[2] Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976).
[3] Squirtco v. Seven-Up Co., 628 F.2d 1086,1089 n.4, 1091 (8th Cir. 1980).

5

does to support his survey design is cite to Swann.[4]  However, he is not completely accurate when, referring to Swann, Mr. Johnson states in paragraph 7 of his report, "The *Eveready* format is considered the 'gold standard' approach to measuring likelihood of confusion and is widely accepted by Federal courts."

19.     The complete sentence he is referring to actually is "[the *Eveready* design] has become . . . the gold standard in cases where the senior mark is top of mind, i.e. highly accessible . . . in memory."

20.     Put another way, Swann is saying that the *Eveready* design is the gold standard in instances where the senior user's mark is well known.  Later, at page 63, Swann states: "With respect to strong marks, therefore, the *Eveready* format is a relevant, reliable, and objective test of likelihood of confusion."

21.     And on page 64 Swann states:   "*Eveready* should be regarded as the 'model' for testing likelihood of confusion as to top-of-mind marks."

22.     To paraphrase Swann, further on that page, few senior users' marks have such a high level of awareness that they are likely to be elicited with an *Eveready* design.

23.     Swann finally states: "an *Eveready* format will consistently produce negligible estimates of likelihood of confusion."

24.     Not surprisingly, that is exactly what Mr. Johnson found in his study.

25.     A "top-of-mind" mark is one that has a high level of unaided awareness. For example: IBM, Chevy, Tide, Oreos, Cheerios, Apple, etc.  Consumer awareness of the RISE Marks is not in that category.  That means that, although consumers could

---

[4] Swann, J. (2012). Likelihood of Confusion. In S. Diamond & J. Swann (Eds.), Trademark and Deceptive 1st Advertising Surveys: Law, Science, and Design (ed., p. 53).  American Bar Association.

recognize the name (aided awareness), people are unlikely to think of the RISE Marks unaided.  Earlier in the Swann article (pages 61 and 62) he cites Welter who said, when an "open-ended [*Eveready*] question [is] used [in connection with] a mark that is not particularly well-known, it needs to be understood that the . . . 'top-of-mind' awareness of the brand … required [by the format] may significantly underestimate [the likelihood of] confusion."[5]

26.     One must always keep that in mind when viewing the results of an *Eveready* design study if the senior mark has low top-of-mind awareness.  It is apparent that Rise Brewing's RISE Marks likely do not have high top-of-mind or unaided awareness and the *Eveready* design contains a built-in bias against brands that do not have high unaided awareness.  Using an *Eveready* design will result in an underestimate of the likelihood of confusion.

27.     Selecting an *Eveready* design is a fatal flaw in Mr. Johnson's study and everything that flows from it.

28.     This becomes obvious when you examine the underlying psychological processes that would result in a person not being confused in a likelihood of confusion study using an *Eveready* design.  A person could be aware of the senior user's mark, and when shown the junior user's mark, not confuse the two.  We can call that aware non-confusion because the person has made a fully-informed judgment.  Alternatively, a person could be unaware of the senior user's mark and when shown the junior user's mark, not confuse the two because he or she is not aware of the senior user's mark.  We can call that unaware non-confusion because, should the respondent become

---

[5] Phyllis J. Welter, Trademark Surveys § 24.03[1][c] (1999); Simon  & Schuster v. Dove Audio, Inc., F. Supp. 279, 292, (S.D.N.Y. 1997).

7

aware of the senior users mark at a later point, he or she could then confuse the two marks, or still not confuse them. One can argue that it does not matter because in both instances there is no confusion, but unaware non-confusion could be temporary, subject to becoming aware of the senior user's mark.

29. The *Eveready* design confounds the two types of confusion. It counts people who are not confused because they are unaware of the senior user's mark the same as those who were not confused because they were aware of the senior user's mark but did not confuse it with the junior user's mark. The marketplace is not static. People become aware of new brands every day. Unaware confusion can change at any time, especially if the marks are proximate to each other. Therefore, because of the RISE Marks' low unaided awareness, the *Eveready* design is inappropriate in this matter.

30. Mr. Johnson used an *Eveready* design when he tested for likelihood of confusion in this matter and, not surprisingly, found little to no confusion.

31. If one were to even attempt to run a reverse confusion survey between these two brands, a *Squirtco*-type design would be more appropriate where, as here, the senior user's mark is not well known. In a *Squirtco* design reverse likelihood of confusion study, the consumer is shown the senior user's mark, as would be likely in the marketplace. Later the consumer sees the junior user's mark, potentially along with other relevant marks.

32. There is, however, a requirement to make the *Squirtco* design appropriate. The *Squirtco* design requires that both users' marks be proximate to each other, either spatially or temporally. If they are not proximate, the consumer could be made aware of

two marks artificially.  This could result in overstating the likelihood of confusion.  In addition, if the two marks are proximate in the marketplace then the research design should reflect that.  In commenting on this McCarthy opined that "the closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[6]  Simonson and Kivitz[7] observed that "the purpose of a [Likelihood of Confusion] survey is to provide a reliable estimate of the likelihood of confusion in a relevant marketplace; that is, the selection of the suitable survey method should be based primarily on the marketplace-resemblance criterion."

33. In this instance, the marketplace-relevant criterion suggests a *Squirtco* design would have been more appropriate.  As the two photographs below show, the two beverages are found close to each other in both a refrigerated aisle display and in a checkout cooler.

---

[6] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:165  (4th ed. 2008).
[7] Simonson, I. and Kivitz, R. (2012). Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions. In S. Diamond & J. Swann (Eds.), Trademark and Deceptive Advertising Surveys: Law, Science, and Design (1st ed., p. 250). American Bar Association.





10

34. Other examples of actual confusion among consumers and people at different levels of the distribution chain have been documented.[8]

35. The use of the *Eveready* design with a low-awareness mark introduces a systematic bias that cannot be corrected. Not all marks are like Nike or Apple.

36. The plight of the legitimate senior user, whose mark has relatively low awareness, is a serious concern. In any research situation where the senior user has a legitimate mark that is not well known and the junior user has a mark that is confusingly similar on its face, the junior user can exploit the low unaided awareness of the senior user's mark by using an *Eveready* design and showing low confusion between the marks even though most of the lack of confusion would have been due to a transient lack of awareness of the senior user's mark. The *Eveready* design confounds or equates non-confusion with lack of awareness even though the two are very different concepts.

37. I believe Mr. Johnson's research is a clear example of that problem. I do not believe that evidence based on such fundamentally flawed research should be relied upon in such a serious matter as this.

# CERTIFICATION

Pursuant to 28 U.S.C. § 1746, I declare that the foregoing is true and correct.

August 25, 2021
Date

*L.B. Kaplan*
Leon B. Kaplan, Ph.D.

---

[8] Declaration of Allison Schmidt.

11