UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
RISEANDSHINE CORPORATION d/b/a  :
RISE BREWING,                                      :
                                                             :          21 Civ. 6324 (LGS)
                                      Plaintiff,    :
                                                             :          **AMENDED**
                      -against-                   :          **OPINION & ORDER**
PEPSICO, INC.,                                  :
                                                             :
                                  Defendant.   :
                                                             :
-------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

Plaintiff RiseandShine Corporation d/b/a Rise Brewing ("Rise Brewing") brings this

trademark infringement action against Defendant PepsiCo, Inc. ("PepsiCo"). Plaintiff is the

owner of certain registered "RISE" marks that it uses with its canned caffeine drinks. Plaintiff

alleges that Defendant's recently launched, canned caffeinated drink called "MTN DEW RISE

ENERGY" infringes on Plaintiff's marks. Plaintiff alleges that Defendant's infringement is

causing actual confusion in the market, has destroyed Plaintiff's reputation and goodwill and has

impeded Plaintiff's ability to raise capital from outside investors. The First Amended Complaint

alleges violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York trademark and

competition law and asserts a claim of unjust enrichment. Plaintiff moves for a preliminary

injunction to enjoin Defendant from using the RISE mark while this case proceeds. For the

following reasons, Plaintiff's motion for a preliminary injunction is granted.

I.        **BACKGROUND**

Founded in 2014, Plaintiff sells ready-to-drink, canned coffee and tea-based beverages

that are marketed and sold as RISE. Plaintiff displays its "RISE BREWING CO." mark on each

can, with RISE in large, red capital letters against a light background on the top third of the can,

as shown in the image below, with the words "Brewing Co." appearing in a much smaller font immediately below RISE.  Plaintiff registered that mark with the U.S. Patent & Trademark Office ("PTO") in November 2017, and also owns other RISE registered marks.

In 2017, Plaintiff's CEO, Grant Gyesky, met with members of Defendant's Innovation team to discuss a potential partnership opportunity.  Two more meetings between Plaintiff and Defendant followed, first on May 10, 2018, and again on January 24, 2019.  Those discussions did not result in a business relationship.

In January 2021, Plaintiff learned that Defendant intended to launch a fruit-flavored caffeinated canned beverage under the mark MTN DEW RISE ENERGY.  Plaintiff's counsel wrote Defendant's counsel, asking Defendant to "abandon any intent" to use the mark "MTN DEW RISE ENERGY" due to potential confusion with Plaintiff's products.  The parties failed to reach agreement.  Defendant's product launched in March 2021.  As shown below, the MTN DEW RISE ENERGY mark appears prominently in the top portion of the can, with the RISE portion of the logo in all-capital, brightly colored letters against a light background on the top third of the can, and MTN DEW in a smaller font immediately above RISE.  This action followed.

| Plaintiff's Product | Defendant's Product |
| --- | --- |
|  | |

## II.  PROCEDURAL HISTORY & EVIDENTIARY HEARING

Plaintiff commenced this action in the U.S. District Court for the Northern District of Illinois on June 15, 2021.  Defendant moved to transfer the case to this Court on June 28, 2021.

Plaintiff moved for a preliminary injunction on June 29, 2021, with the following seven

declarations in support of the motion:

- Corey Guidi -- Plaintiff's Area Sales Manager for Northern California, described placement of Plaintiff's and Defendant's products in Walmart, Safeway and Raley's stores.  Mr. Guidi stated that, "[i]n all of [his] international chain accounts, PepsiCo's RISE is stocked on the same aisle as [Plaintiff's] RISE products, so consumers encounter them as alternative caffeinated beverage options."

- Grant Gyesky -- CEO and Co-Founder of Rise Brewing, described the company's founding, trademarks and products, including the company's target market and current distribution.  Mr. Gyesky also described communications between the parties in 2017, as well as Plaintiff's efforts to contact Defendant regarding the launch of its RISE drink between January and April 2021.

- Melissa Kalimov -- Plaintiff's COO, described an incident on April 30, 2021, when an industry contact was confused by an in-store promotional display for *Defendant's* product and asked her, "I see coffee on here and Rise.  Is this new?"

- Nia Kaye -- Plaintiff's Regional Sales Manager for the Southeast, described an incident on May 20, 2021, when she visited a Publix grocery store in Florida and asked the manager on duty to check if there was more "RISE" in the backroom because there was not much of Plaintiff's product on the shelves.  In response, the manager asked if she meant "Mountain Dew RISE."

- Jarrett McGovern -- co-founder and current Chief Creative Officer of Rise Brewing, described the circumstances leading up to and including the May 2018 and January 2019 meetings with Defendant's Innovation team, and provided related emails from before and after those meetings.

- Rachel Ratliff -- Plaintiff's Senior Regional Sales Manager for the Midwest, described an incident on March 3, 2021, when a Mariano's grocery store employee texted her, saying that Rise Energy had been selected for a promotional opportunity only to learn later that the promotion was not for Plaintiff's product but instead for "a new line of energy drinks by Pepsi called RISE."

- Emily Welch -- one of the outside lawyers representing Plaintiff, provided information and documents from the PTO regarding Plaintiff's various trademark applications and registrations, as well as copies of articles, press releases and tweets regarding Defendant's product and its launch.

Defendant opposed and sought a stay of Plaintiff's preliminary injunction motion

pending a decision on Defendant's motion to transfer.  Plaintiff opposed any stay and, on July 8,

2021, filed a cross-motion for expedited discovery and briefing for its preliminary injunction

motion.  On July 22, 2021, the District Court in Illinois granted Defendant's motion to transfer.

Following the transfer to this Court, on July 26, 2021, Plaintiff filed an amended

complaint (the "Complaint") and renewed its motion for a preliminary injunction (the "Motion").

A hearing was scheduled for August 13, 2021, following Defendant's response.  Defendant filed

its answer on August 9, 2021, and its opposition to the Motion the next day, with the following

five declarations:

- Fabiola Torres -- Chief Marketing Officer, Senior Vice President of Energy Category at PepsiCo, described the development, launch and marketing of MTN DEW RISE ENERGY, including selection of the mark.

- Kathryn Walker -- Vice President of Commercial Planning for Energy, a division within PepsiCo, described retailers' marketing of Defendant's product, the extent of Defendant's sales of its product, and harm to PepsiCo if an injunction were entered.

- Philip Johnson -- a retained expert who conducted a consumer survey to measure reverse confusion between the parties' respective products and prepared a written report dated August 9, 2021.

- Melissa Pittaoulis -- a retained expert who conducted a survey to evaluate the likelihood of forward consumer confusion between the parties' respective products and prepared a written report dated August 9, 2021.

- Emily Pyclik -- one of the outside lawyers representing Defendant, provided information and documents from the PTO regarding various trademark applications and registrations of non-parties incorporating the word "RISE" or variants in connection with goods and services, and related information; Plaintiff's May 24, 2016, Office Action Response regarding its application to register RISE COFFEE CO. & Design; a side-by-side photo of the parties' respective products; and correspondence between the parties.

Upon receipt of Defendant's submissions, Plaintiff was ordered to file a reply, and the

hearing was adjourned to September 9, 2021.  On August 25, 2021, Plaintiff filed a reply with

declarations from Allison Schmidt, Alex Tanev, Leon Kaplan, and Holly Hawkins Saporito.  On

August 26, 2021, Plaintiff filed a letter motion for leave to file these additional declarations,

4

which the Court denied on August 27, 2021.  On September 9, 2021, the Court heard oral argument on the Motion.

Following oral argument, on September 17, 2021, Defendant filed a motion for an evidentiary hearing, claiming that Plaintiff had made arguments without evidentiary support and relied on the declarations filed with Plaintiff's reply.  Defendant asked for "the chance to demonstrate why these declarations do not support [Plaintiff's] claims" and present evidence to assist in fashioning any injunction.  The Court granted Defendant's request on September 21, 2021.  On September 27, 2021, the parties filed a joint letter apprising the Court of the names of any witnesses to be called and the proposed topics to be discussed.  In that letter, Defendant objected to Plaintiff's calling Allison Schmidt, Steve Salzinger or Leon Kaplan as witnesses at the hearing, which the Court overruled on September 28, 2021.  On September 29, 2021, Defendant filed a motion for reconsideration or, in the alternative, asked to supplement its witness list to "respond to Plaintiff's new witnesses."  Plaintiff responded the next day, countering that Defendant renewed its request for an evidentiary hearing specifically to have the opportunity "to cross-examine witnesses on the issues it alleged were raised for the first time at the [September 9, 2021], hearing," including Plaintiff's difficulties securing investments, newly obtained actual confusion evidence and Dr. Kaplan's expert report.  Plaintiff also objected to Defendant's request to supplement its witness list.  On September 30, 2021, the Court denied Defendant's motion for reconsideration and granted Defendant's motion to supplement its witness list.

Due to the COVID-19 pandemic, the evidentiary hearing was held via video conference on October 8, 2021.  Plaintiff offered credible evidence on incidents of actual confusion, the

likelihood of confusion and irreparable harm.  Specifically, Plaintiff called four lay witnesses

and one expert witness:

- Grant Gyesky testified about the history and current status of Plaintiff's business and trademarks; past dealings with Defendant; Plaintiff's financial position; actual confusion in the marketplace and the harm that Defendant's product has caused Plaintiff.

- Steve Salzinger is a professional investor in early-stage companies.  Mr. Salzinger testified that, although he has participated in six of seven rounds of Plaintiff's financing, he has decided to withhold further investment in the company due to the marketing and sale of Defendant's product and the resulting consumer confusion.

- Rachel Ratliff testified about the sale of Plaintiff's products, product placement in stores and actual confusion in the marketplace between the parties' respective products.  Ms. Ratliff also testified about the March 3, 2021, incident involving a Mariano's assistant store manager who mistakenly informed Ms. Ratliff that Plaintiff had been chosen for a promotion -- when the promotion was for Defendant's product.

- Allison Schmidt is one of Plaintiff's brand ambassadors.  Ms. Schmidt testified about instances of confusion in product ordering, product placements in stores, Plaintiff's proposed sponsorship of certain athletic events, and at regular consumer tastings in the Cincinnati area.  Ms. Schmidt described confusion in stores and at product tastings as the "norm . . . not the exception at this point" and that she is regularly asked if Plaintiff's product is the new coffee version of Mountain Dew.  Ms. Schmidt's declaration, which had been filed with Plaintiff's reply, also was admitted into evidence at the hearing.

- Leon Kaplan, Plaintiff's expert witness, testified briefly to rebut Defendant's survey experts and their respective reports.  Mr. Kaplan's rebuttal report also was admitted into evidence at the hearing.

In response, Defendant relied on the previously filed report of its survey expert and called

three lay witnesses:

- Jim Lee, Chief Strategy and Transformation Officer and SVP, PepsiCo Beverages North America, testified about different product categories within the industry and the absence of any effect on Plaintiff from the launch and sales of Defendant's product.  Mr. Lee testified that Defendant's product had been developed independently and that his team had "never looked" at Plaintiff because of Defendant's twenty-five-year joint venture with Starbucks.

- Greg Lyons, Chief Marketing Officer, PepsiCo Beverages North America, testified about the circumstances leading to the development of Defendant's product.  Mr. Lyons testified that the company had been interested in getting into the energy drink segment following the company's acquisition of Rockstar and chose the name "Rise" for its product because it connotes "morning" and also had "an emotional meaning" that encourages consumers to "g[e]t their day started right."  In addition, Mr. Lyons testified on the harm to Defendant if a preliminary injunction were issued.

- Bryan Santee, Vice President Sales -- National Accounts, PepsiCo Beverages North America, testified about the distribution and marketing of Defendant's product, including placement in stores.  In addition, Mr. Santee testified about the harm Defendant would suffer if the Motion were granted, including the timeline and cost associated with changing product packaging.

Following the evidentiary hearing, on October 11, 2021, the parties filed several exhibits admitted into evidence at the hearing.[1]  The same day, Defendant also objected to "one-sided record supplementation" at the hearing and requested three weeks of "targeted, expedited discovery" on issues related to store layouts, investor concerns, internet search results and Ms. Schmidt's testimony on instances of actual confusion.  Plaintiff responded on October 14, 2021.  The objections were overruled and the application for discovery on the preliminary injunction motion denied.

## III.   LEGAL STANDARD

Plaintiff seeks an order preliminarily enjoining Defendant from continuing to manufacture or sell its infringing RISE products.  "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and

---

[1]  Immediately after the evidentiary hearing, on October 8, 2021, Defendant filed a motion requesting the Court to take judicial notice of the complaint filed in *RiseandShine Corp. v. Hendricks*, No. 21 Civ. 232 (W.D.N.C. Aug. 1, 2021).  The Court has reviewed that complaint and, to the extent relevant, considers it alongside the parties' other submissions.

(3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).[2]  The Second Circuit has consistently applied this standard in trademark cases.[3]  *See, e.g.*, *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2021) (summary order); *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012).

## IV.   DISCUSSION

Plaintiff is entitled to a preliminary injunction because Plaintiff has demonstrated irreparable harm, a likelihood of success on the merits of the federal trademark claim and that the public interest weighs in favor of granting the injunction.

---

[2]  The Second Circuit has articulated two versions of this standard.  *Compare N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (three-factor test), *with Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (four-factor test weighing balance of hardships separately from merits issues).  Any difference between these standards is immaterial here because Plaintiff has demonstrated that the balance of hardships tips in its favor.

[3]  "Courts refer to preliminary injunctions as prohibitory or mandatory.  Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League, LLC*, 883 F.3d at 36.  "Because mandatory injunctions disrupt the status quo," they are subject to "a heightened legal standard by showing a clear or substantial likelihood of success on the merits." *Id.* at 37 (internal quotation marks omitted).  In deciding whether a preliminary injunction is mandatory or prohibitory, the Second Circuit has defined "status quo" as "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.* (internal quotation marks omitted).  Because Plaintiff seeks to restore the status quo prior to Defendant's alleged infringement, the heightened standard for mandatory injunctions does not apply.  *See Two Hands IP LLC v. Two Hands Am., Inc.*, No. 21 Civ. 3855, 2021 WL 4437975, at *2 n.2 (S.D.N.Y. Sept. 28, 2021) ("[T]he plaintiff seeks to halt the alleged infringement of its marks.  Such an injunction is generally considered to be prohibitory, rather than mandatory." (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006))).  Even if the heightened standard applies here, it is satisfied because Plaintiff has shown, not only a likelihood of success on the merits as discussed in the text, but also a clear or substantial likelihood of success on the merits.

### A.      Likelihood of Success on the Merits

Plaintiff has shown a likelihood of success on the two elements of a federal trademark claim -- (1) that Plaintiff "has a valid mark that is entitled to protection" and (2) that "the defendant's 'actions are likely to cause confusion with [that] mark.'"  *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (alteration in original) (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)).

### 1.      Protectability of the Marks

The mark central to this case, depicted here, (the "Mark") was registered in November 2017 (Reg. No. 5,333,635).



Because it is registered, the Mark is presumptively valid subject to any legal or equitable defense.  15 U.S.C. § 1115(a).  Defendant does not contest the validity of Plaintiff's various registered RISE marks.  Plaintiff is thus likely to prevail on the first element of its federal trademark claim -- showing the validity and protectability of its Mark.

### 2.      Likelihood of Confusion

To prevail on the second element of a federal trademark infringement claim, a plaintiff "must demonstrate that . . . the defendant's 'actions are likely to cause confusion with [that] mark.'"  *Tiffany*, 971 F.3d at 84 (quoting *Sports Auth., Inc.*, 89 F.3d at 960).  But the "mere

possibility" of confusion is not enough; rather, a plaintiff must prove "a *probability* of confusion . . . affecting numerous ordinary prudent purchasers." *Id.* (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005)).

Plaintiff brings this infringement action under a "reverse confusion" theory.  "Reverse confusion" exists where a junior user "selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the [senior] user are produced by the [junior] user." *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991); *accord Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988).  "The reverse confusion theory protects the mark of a [senior] user from being overwhelmed by a [junior] user, typically where the [junior] user is larger and better known and consumers might conclude that the senior user is the infringer." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 666 (S.D.N.Y. 2016) (internal quotation marks omitted).

In determining whether there is a likelihood of reverse confusion, courts in the Second Circuit apply the eight-factor balancing test set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ("*Polaroid*").  They are:

> (1) the strength of the trademark; (2) the degree of similarity between the plaintiff's mark and the defendant's allegedly imitative use; (3) the proximity of the products and their competitiveness with each other; (4) the likelihood that the plaintiff will "bridge the gap" by developing a product for sale in the defendant's market; (5) evidence of actual consumer confusion; (6) evidence that the defendant adopted the imitative term in bad faith; (7) the respective quality of the products; and (8) the sophistication of the relevant population of consumers.

*Tiffany & Co.*, 971 F.3d at 84-85 (citing *Polaroid*, 287 F.2d at 495; *Starbucks Corp. v. Wolf's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)).  Six of these factors -- the strength of the mark, the similarity of defendant's mark to plaintiff's; the proximity of the products sold under defendant's mark to those under plaintiff's; where the products are different, the likelihood that plaintiff will bridge the gap; the existence of actual confusion; and the sophistication of

consumers -- directly relate to the likelihood of confusion. *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146-47 (2d Cir. 2003). The other two -- good faith and the quality of defendant's products -- are more pertinent to other issues, such as harm to plaintiff's reputation and choice of remedy. *Id.* at 147.

The principal question in this case is whether Defendant's use of the term "RISE" on its caffeinated drink is likely to cause confusion with Plaintiff's Mark. Plaintiff has shown that it is likely to prevail on that question particularly because of the similarity between the two marks, the proximity of Defendant's area of commerce to Plaintiff's and the credible testimony at the October 8, 2021, hearing from Mr. Gyesky, Ms. Ratliff and Ms. Schmidt on instances of actual confusion.

i.     *Strength of the Mark (Factor 1)*

The first factor is strength of the mark. Plaintiff primarily relies on the word "RISE" in the Mark to establish confusion. As explained below, this factor tilts slightly in Plaintiff's favor.

"The first pertinence of the strength of a mark has to do with likelihood of public confusion. The more unusual and distinctive a particular mark, the more likely the consumer will assume, upon seeing it essentially replicated, that the newly observed user is the same as, or affiliated with, the originally observed user." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 41 (2d Cir. 2016); *see also Star Indus., Inc.*, 412 F.3d at 384 ("The strength of a mark is determined by its tendency to uniquely identify the source of the product."). A mark's "strength" is "crucial to the likelihood of confusion analysis" in a reverse confusion case because a plaintiff's well-known association with the claimed mark "makes it much more likely that consumers will assume wrongly that [the plaintiff] is somehow associated with [the defendant's

product] or has authorized the use of its mark." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986); *accord LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 668.

The strength of a trademark "is analyzed based on two components:  (1) the degree to which [the mark] is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020) (internal quotation marks omitted).  Inherent distinctiveness is assessed using four categories of marks that indicate increasing distinctiveness and protectability: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful.  *See id.*; *accord Two Hands IP LLC v. Two Hands Am., Inc.*, No. 21 Civ. 3855, 2021 WL 4437975, at *6 (S.D.N.Y. Sept. 28, 2021).  A descriptive mark is "one that tells something about a product, its qualities, ingredients or characteristics." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993).  A suggestive mark suggests the product, though it may take imagination to grasp its nature. *Id.*  An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product, and a fanciful mark is a made-up name. *See id.* at 1075-76.

Plaintiff's Mark is suggestive because the word "RISE" is "not directly descriptive," but evokes images of morning, which "suggest[s] a quality or qualities of the product through the use of imagination, thought and perception." *Star Indus., Inc.*, 412 F.3d at 385 (internal citation and quotation marks omitted).  Suggestive marks are considered inherently distinctive. *Id.*

"However, suggestive marks are not necessarily distinct in the marketplace." *Two Hands IP LLC*, 2021 WL 4437975, at *7.  Market distinctiveness "is determined by analyzing six factors:  advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and

exclusivity of the mark's use." *Car-Freshner Corp.*, 980 F.3d at 329 (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)).

Taken together, these factors tilt slightly in favor of Plaintiff. This assessment takes into consideration the procedural posture and present inquiry -- i.e., whether Plaintiff has shown a sufficient likelihood of future success on the merits to warrant injunctive relief now. Plaintiff's CEO testified that the company was founded in 2014, has invested more than $17.5 million in promoting its "RISE" marks, and has received a number of awards for its products, including winning "Best New Product" in 2017 from *BevNet* for its nitro cold brew coffee; "Beverage Innovation of the Year" in 2018 from *Beverage Industry* magazine; "2018 NEXTY Best New Organic Beverage Award" from New Hope Network; and "Best Canned Coffee" in 2019 from People Magazine for its canned nitro cold brew product. At this early stage of the litigation, Plaintiff has not provided any consumer studies linking "RISE" to its business or any evidence of attempts to plagiarize its marks. As for exclusivity, Plaintiff appears to have been the exclusive user of the principal term "RISE" to identify a single-serving, canned caffeinated beverage (until the launch of Defendant's product), although there are other commercial uses of the term "RISE" among morning beverages.[4]

Defendant counters that Plaintiff acknowledged the generic nature of the "RISE" mark before the PTO in 2015, writing "[t]he records of the Patent and Trademark Office demonstrate that many entities have used the word 'Rise' in relation to the Applicant's goods, making it

---

[4] Defendant filed a motion asking this Court to take judicial notice of a case currently pending in the Western District of North Carolina involving Plaintiff and the alleged producers of a canned, caffeinated beverage called "RIZE." The parties in that case appear to dispute when the "RIZE" drink became available for sale and whether it is still on the market. Complaint, *RiseandShine Corp. v. Hendricks*, No. 21 Civ. 232 (W.D.N.C. Aug. 1, 2021).

unlikely that consumers would give significant weight to this term in ascertaining the source of such goods." "In general, courts do not bind parties to their statements made or positions taken in ex parte application proceedings in front of the PTO." *Alpha Media Grp., Inc. v. Corad Healthcare, Inc.*, No. 13 Civ. 5438, 2013 WL 5912227, at *3 (S.D.N.Y. Nov. 4, 2013) (noting, at most, such statements can be "considered as evidence, albeit not conclusive evidence, of the truth of the assertions"). Defendant's argument also is undercut by testimony from its own witness, Mr. Lyons, who testified that Defendant chose to name its product "RISE" following surveys that found the term had "an emotional meaning" that appealed to consumers. In addition, the Mark consists of more than the word "RISE" taken alone and out of context, but includes "the stylized logo of that name including the unusual form and shape of the letters comprising the word." *Gruner + Jahr USA Publ'g Div. of Gruner + Jahr Printing & Publ'g Co.*, 991 F.2d at 1077-78 ("In analyzing the strength of the mark for likelihood of confusion purposes, we observe again that the actual trademark registration in this case protects not the name or the word "parents," but rather the stylized logo of that name including the unusual form and shape of the letters comprising the word."). Accordingly, this factor tilts slightly in Plaintiff's favor.

ii.      *Similarity of the Marks (Factor 2)*

The second factor is the similarity of the marks. This inquiry involves looking at "how [the marks] are presented in the marketplace." *Sports Auth., Inc.*, 89 F.3d at 962. "In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Publ'g, a Div. of Gruner + Jahr Printing & Publ'g Co.*, 991 F.2d at 1078; *accord Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 587 (S.D.N.Y.

2015) ("In evaluating similarity, a court looks at how a mark as a whole sounds, looks and feels --
-- reviewing the size of a mark, design of a logo, the typeface, how a word sounds when
spoken.").

Here, the two marks are confusingly similar in appearance.  Both highlight the single
word "RISE."  *See Virgin Enters. Ltd.*, 335 F.3d at 149 (reversing district court's denial of
preliminary injunction where plaintiff's and defendants' marks " both consisted of the same
word, 'virgin'").  On both of the parties' respective products, "RISE" is printed on a beverage
can, in large typeface, in all-capital letters, in a bright color against a light background and is the
dominant feature occupying the top third of the can.  The other terms, the parties' respective
house marks -- i.e., "Brewing Co." and "Mtn. Dew" -- appear in much smaller lettering.  *See*
*Flushing Bank*, 138 F. Supp. 3d at 587 ("Factors which courts consider in this regard include
mode of presentation, typeface, inclusion of additional words, dress colors, and associated tie-
ins, such as a mascot.").

Defendant argues that the appearance of the parties' products that bear the marks are not
confusingly similar because the cans themselves are different sizes, the logos are in different
fonts and Defendant's use of the house mark "MTN DEW" mitigates against any confusion.  To
support this argument, Defendant relies heavily on *Nabisco, Inc. v. Warner-Lambert Co.*, 220
F.3d 43, 47-48 (2d Cir. 2000).  In *Nabisco,* the Court of Appeals affirmed summary judgment for
the defendant and relied on, among other things, the defendant's use of the house mark
"DENTYNE" to conclude that the mark "DENTYNE ICE" was not confusingly similar to the
plaintiff's mark "ICE BREAKERS."  But the *Nabisco* case dealt with forward confusion -- not
reverse confusion as Plaintiff claims here.  In a reverse confusion context, that a junior user
employed a house mark does not necessarily resolve alleged confusion because the "essence" of

a reverse confusion claim "is that the junior user overpowers the senior user's mark." *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 160 n.8 (S.D.N.Y. 2011) (collecting cases), *aff'd*, 508 F. App'x 31 (2d Cir. 2013); *see also* McCarthy on Trademarks and Unfair Competition § 23.10 (5th ed. Sept. 2021) ("In a reverse confusion situation, rather than trying to profit from the senior user's mark, the junior user saturates the market and overwhelms the senior user.  The result is that the senior user loses the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.") (internal quotation marks omitted).

Defendant's other arguments fail because they do not consider the parties' respective marks holistically.  The Second Circuit has made clear that, "[w]hen evaluating the similarity of marks, courts consider the overall impression created by a mark.  Each mark must be compared against the other as a whole; juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar."  *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 133 (2d Cir. 2004).  For the reasons discussed, the similarity of the marks tips strongly in Plaintiff's favor.

### iii.        *Proximity of the Products (Factor 3)*

The third factor is the proximity of the products and their competitiveness with each other.  "The proximity factor can apply to both the subject matter of the commerce in which the two parties engage and the geographic areas in which they operate."  *Guthrie.*, 826 F.3d at 39. Here, the proximity factor tips decidedly in favor of Plaintiff.  The products at issue are both canned, caffeinated drinks.  Plaintiff sells coffee and tea drinks, while Defendant sells fruit-flavored energy drinks.  The products are sold through the same trade channels -- grocery stores and convenience stores.  Both products are sold nationally.

The parties dispute, and offer conflicting evidence of, whether their respective products are likely to be placed in close physical proximity in grocery stores.  This evidence misses the point.  The premise of the proximity factor is that "the public is less likely to draw an inference of relatedness from similar marks when the marks' users are in *dissimilar areas of commerce* . . . .  The more likely it appears that an enterprise in one party's area of commerce might also engage in the other party's area of commerce, the greater the likelihood that the public will infer an affiliation from the similarity of the marks."  *Guthrie*, 826 F.3d at 39 (emphasis added) (providing the example for proximity analysis that similar trademarks used for a coffee shop and antivirus computer software are less likely to be confusing than similar trademarks both used for coffee shops in two different but not distant locations).   Particularly in this reverse confusion case, the question is whether the products are in sufficiently similar areas of commerce that a consumer may erroneously believe that the goods marketed by Plaintiff, the senior user, are produced by or affiliated by the junior user, Defendant, which sells MTN DEW RISE ENERGY.  The focus is not on physical proximity on the grocery shelf, but on whether the products are in similar or dissimilar areas of commerce.  Here the two canned and caffeinated drinks indisputably are.

### iv.    *Bridging the Gap (Factor 4)*

The fourth factor is the likelihood that the plaintiff will "bridge the gap" by developing a product for sale in the defendant's market.  This factor is inapplicable here.  Where the parties' products are already in competitive proximity, as in this case, there is "no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis."  *Star Indus.*, 412 F.3d at 387 (treating this factor as neutral where both parties used marks on liquor bottle labels); *accord Guthrie*, 826 F.3d at 45.

v.      *Actual Confusion (Factor 5)*

The fifth factor is actual confusion, and it weighs in favor of Plaintiff.  "[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Guthrie*, 826 F.3d at 45 (finding a likelihood of confusion and broadening the scope of the District Court's permanent injunction despite no evidence of actual confusion); *accord Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021) (summary order).

Nevertheless, "[i]nstances of actual confusion resulting from a junior user's use of a mark similar to a senior user's can be powerful evidence supporting a likelihood of confusion." *Guthrie*, 826 F.3d at 44.  Plaintiff presented the credible testimony of Mr. Gyesky, Ms. Ratliff and Ms. Schmidt describing multiple instances of actual confusion since Defendant's product launched in March 2021.  Although Defendant presented contrary survey evidence showing no confusion, Plaintiff proffered its own expert testimony critiquing the survey results.  In the context of this case, survey results may be particularly unreliable.  As the Court in *Guthrie* observed, "[T]he absence of evidence of actual confusion does not necessarily prove anything, especially when there has been neither long nor significant experience of the two trademarks operating side-by-side in the same market." *Id.*

vi.      *Bad Faith (Factor 6)*

The sixth factor is the defendant's bad faith in adopting the imitative term.  This factor, along with the quality of the products, is not "of high relevance to the issue of likelihood of confusion." *Virgin Enters. Ltd.*, 335 F.3d at 151.  Rather, "[a] finding that a party acted in bad faith can affect the court's choice of remedy or can tip the balance where questions are close." *Id.*  Here, Plaintiff asserts that Defendant adopted its mark in bad faith after meetings between

18

the parties failed to produce a partnership.  At this stage prior to any discovery, the record is too thin to support a finding of bad faith.  This factor therefore favors neither party.

       vii.         *Quality of the Products (Factor 7)*

The seventh factor is the quality of the respective products.  This factor primarily affects the issue of harm to the senior user's reputation and is less pertinent to the likelihood of confusion.  *Virgin Enters. Ltd.*, 335 F.3d at 151.  Plaintiff's products are marketed as being made with organic ingredients.  Defendant's products are not organic and could tarnish Plaintiff's reputation as a provider of healthy or organic products.  *See Guthrie*, 826 F.3d at 44 n.6 ("[I]n some circumstances, the *Polaroid* factor that ordinarily focuses on the quality of the junior user's commerce can also be affected by the nature or subject matter of the junior user's commerce when those are objectionable for whatever reason to the senior user's customers.").  This factor weighs in favor of finding a likelihood of success on the merits.

       viii.        *Buyers' Sophistication (Factor 8)*

The eighth factor is the buyers' sophistication.  Plaintiff relies on the products' low price point as indicative of low customer sophistication.  *See Starbucks Corp.*, 588 F.3d 97, 119 (2d Cir. 2009).  But "price alone is not determinative of the care a consumer will take in making purchases, and our touchstone remains the general impression that is left with the ordinary consumer."  *Id.* (internal citations omitted).  This factor is inconclusive on this record because a purchaser of *organic* caffeinated drinks might well be more discriminating than a purchaser of caffeinated canned beverages, and Plaintiff has offered no evidence to show low buyer sophistication.

ix.     *Overall Likelihood of Confusion*

In sum, given the degree of similarity between Plaintiff's and Defendant's marks, the proximity of their areas of commerce, and credible testimony of actual confusion, Plaintiff has met its burden of showing a sufficient likelihood of success on the merits to warrant a preliminary injunction, regardless of whether the relevant standard is a clear or substantial likelihood, a simple likelihood, or serious questions on the merits. *See generally Guthrie*, 826 F.3d at 46; *Virgin Enters. Ltd.*, 335 F.3d at 142. Plaintiff has shown that the risk of reverse confusion is probable -- i.e., that without an injunction, Plaintiff is at risk of "being overwhelmed by a subsequent user [PepsiCo], where the subsequent user is larger and better known." *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 666.

**B.     Irreparable Harm**

Plaintiff has sustained its burden of showing irreparable harm. Because Plaintiff has shown a likelihood success on the merits of its federal trademark claim, Plaintiff is entitled to a presumption of irreparable harm, *see* 15 U.S.C. § 1116(a), which Defendant has not rebutted.

Defendant argues that Plaintiff's five-month delay in bringing the Motion rebuts the statutory presumption of irreparable harm. This argument is unpersuasive because, according to Mr. Gyesky's testimony, Plaintiff's prior counsel sent Defendant a cease-and-desist letter in January 2021, before the March launch of Defendant's RISE product and the parties' counsel communicated between January and April regarding a "licensing deal" that would have avoided litigation. Plaintiff first brought a preliminary injunction motion on June 29, 2021. These circumstances -- i.e., the parties' ongoing discussions -- do not support the inference that Plaintiff delayed, not perceiving any immediate or irreparable harm from the launch of Defendant's RISE product. *See Goat Fashion Ltd. v. 1661, Inc.*, No. 19 Civ. 11045, 2020 WL 5758917, at *6 (S.D.N.Y. Sept. 28, 2020) (four-month delay did not rebut presumption of

irreparable harm given settlement discussions); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333-34 (S.D.N.Y. 2011) (sixteen-month delay did not vitiate finding of irreparable harm where parties had settlement discussions); *Polar Corp. v. PepsiCo, Inc.*, 789 F. Supp. 2d 219, 239 (D. Mass. 2011) (rejecting PepsiCo's argument that a seven-month delay was unreasonable, and finding irreparable harm).

### C.      Balance of Hardship

Defendant contends that it would incur substantial rebranding costs, lost sales and harm to its goodwill if this Court issues a preliminary injunction.  These costs must be balanced against the harm to Plaintiff if an injunction does not issue.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.") (internal quotation marks omitted); *Benihana, Inc.*, 784 F.3d at 897 (balancing hardships).

Plaintiff has submitted credible evidence that it faces an existential threat from Defendant's infringement.  For example, at the October 8, 2021, hearing, Plaintiff elicited testimony that Defendant's product has dissuaded at least one investor from re-upping his investment, and additional testimony makes clear that Plaintiff's corporate identity is at risk if Defendant continues to saturate the market.

The Court also is unpersuaded that the harm facing Defendant is not of its own making. "[I]t is 'axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product.'"  *Off-White, LLC v. Alins*, No. 19 Civ. 9593, 2021 WL 4710785, at *5 (S.D.N.Y. Oct. 8, 2021) (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)).  The record makes clear that Plaintiff made efforts to contact Defendant about its product in January

2021, approximately two months before Defendant's product launched, when its former counsel

sent Defendant a cease-and-desist letter.  Defendant then apparently continued to invest heavily

in its product while it seemingly prolonged the adjudication of this motion, which Plaintiff first

filed in June 2021.  Defendant first sought a stay pending a motion to transfer the action from the

Northern District of Illinois.  Later, following oral argument on the Motion, Defendant filed a

motion for an evidentiary hearing, and then used the hearing to re-hash arguments raised at the

September 9, 2021, hearing, before filing a motion "to conduct expedited discovery . . . , with

supplemental briefs to be filed within four weeks."

### D.    Public Interest

Plaintiff also has met its burden of demonstrating that "the public interest would not be

disserved by the grant of a preliminary injunction."  *WPIX, Inc.*, 691 F.3d at 287.  The public

"has a protectable interest in being free from confusion, deception and mistake[.]"  *Goat Fashion

Ltd.*, 2020 WL 5758917, at *16; *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S.

189, 193 (1985) ("[A] sound public policy requires that trademarks should receive nationally the

greatest protection that can be given them."); *see also Benihana, Inc.*, 784 F.3d at 897 ("[T]o the

extent it is implicated, the public interest here is served by the enforcement of the parties' lawful

[licensing] agreement.").

## V.    CONCLUSION

Having considered the parties' written submissions and the evidence and argument

presented at the September 9, 2021, oral argument and October 8, 2021, evidentiary hearing, for

the foregoing reasons, the Court GRANTS Plaintiff's motion for a preliminary injunction.

Defendant is hereby preliminarily restrained and enjoined as follows:

1.    For the purposes of this Preliminary Injunction Order, the following definitions
shall apply:

    a. The "Challenged Mark" shall mean the following mark:  MTN DEW RISE ENERGY.

    b. The "Market" shall mean the United States.

    c. "Advertisement" shall mean any advertisement, flyer, brochure, billboard, display, television commercial, radio commercial, Internet commercial or similar communication of marketing, advertising, sale or promotional information or materials directed to the general public or segments of the general public.

2. Subject to paragraph 7 below, Defendant shall not use or display the Challenged Mark in the Market in connection with the promotion, sale or distribution of single-use, canned energy beverages.

3. Subject to paragraph 7 below, Defendant shall not use or display in the Market any mark that is confusingly similar to Plaintiff's Mark in connection with the promotion, sale or distribution of single-use, canned energy beverages.

4. Subject to paragraph 7 below, Defendant shall not use or display the Challenged Mark in any Advertisement that will be or is intended to be circulated, displayed or broadcast in the Market.

5. Defendant shall not assist, aid or abet any other person or business entity in engaging in any of the activities prohibited by this Order.

6. This Order is binding upon Defendant and its agents, servants and employees, and upon all persons in active concert or participation with it or them (but not any third-party retailers over whom Defendant has no control) who receive actual notice of this Order by personal service or otherwise.  Subject to paragraph 7 below, Defendant shall provide such actual notice.

7. Defendant shall comply with this Order within seven days of its effective date.

8. This Order shall take effect upon the posting of a bond as set forth below, and shall remain in effect until the conclusion of the trial of this matter; provided, however, that this Order may be dissolved or modified upon appropriate motion and a showing of good cause to this Court.

9. Plaintiff shall post a bond in the amount of $250,000 as soon as reasonably practicable after entry of this Order, but in any event no later than one week from the date of this Order.

10. Within eight days of the effective date of this Order, Defendant shall file a report with the Court, setting forth in detail the manner in which Defendant has complied with this Order.

11. The parties may jointly propose any modification to this Order, but only to the

extent that they both agree.

The Clerk of Court is respectfully directed to close the motion at Dkt. Nos. 81 and 133.

The Clerk of Court is respectfully directed to strike Dkt. No. 148.

Dated:  November 4, 2021
        New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**