# EXHIBIT 5

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------x

4  RISEANDSHINE CORPORATION

5  d/b/a RISE BREWING,

6

7                    Plaintiff,

8

9                    No. 1:21-cv-06324 (LGS)

10 vs.

11

12 PEPSICO, INC.,

13

14                    Defendant.

15 -------------------------------------x

16         ***HIGHLY CONFIDENTIAL***

17    ***OUTSIDE ATTORNEYS' EYES ONLY***

18    REMOTE VIDEO-RECORDED DEPOSITION OF

19          HUDSON CALDER GAINES-ROSS

20

21            April 29, 2022

22

23 Stenographically Reported By:

24 Mark Richman, CSR, CCR, RPR, CM

25 Job No. 208625

name RISE come from? Did I read that correctly?
A. Yes.
Q. Okay. And it says (Reading:) We had so many names. In fact, we have an old photo of Jarrett and me holding a whiteboard of all the names we were contemplating. RISE just feels good, you know? It's strong, to the point, it feels like a brand you want to grab off the shelves or out of your fridge those early mornings before work and late nights with friends.
Did I read that correctly?
A. Yes.
Q. Do you have any reason to dispute that those are your sentiment or your words, Mr. Gaines-Ross?
A. No, I don't dispute the document. However, I don't remember giving this interview so --
Q. Understood.
A. I can't say with confidence that I wrote this. You know, sometimes when you have a company, you have like a PR



team or someone, a marketing person writing these on your behalf. So --
Q. Mm-hmm.
A. I just want to clarify that I don't remember giving this. But for conversation purposes, I'm happy to say this is me.
Q. Understood. And you would agree, sir, that the term "rise" is a brand you want to grab off the shelves or out of your fridge those early mornings before work and late night with friends, you agree with that statement, right?
A. Well, I think --
MR. TANCK: Objection to form.
A. I think people can do that. I think that's great. But I think RISE has become much more than that. And I also think that people drink RISE for their own reasons.
Q. Understood.
MS. ESFANDIARIFARD: And we can take that down, Ms. Beltran.
Q. By the time that you all came up with the brand for RISE Brewing Company



which is sometime after early 2015, you would agree with me that you had knowledge of another coffee company utilizing the name "Rise"; is that fair?
MR. TANCK: Object to form, vague.
A. No.
Q. That's not fair?
A. Yeah, I don't, I don't remember another coffee company using it.
Q. You're not -- you don't remember sitting here today another coffee company that used the term "rise" in their name when you all came up with the name for your company sometime from 2015 onward, right?
A. No. And I think we chose that name for that reason.
Q. Gotcha, gotcha, okay.
You're aware of -- let me see here -- RISE Coffee Roasters, fair?
A. No.
Q. Okay. Let's see if this will jog your memory. So we discussed earlier today that you created an Instagram



account called WHAT I'M HOLDING, right?
A. Yes.
MS. ESFANDIARIFARD: And let's bring up Tab 40A if we can, Ms. Beltran.
(Exhibit 10, a screenshot of the account WHAT I'M HOLDING was marked for identification.)
Q. Okay. And Ms. Beltran is sharing a screenshot of the account WHAT I'M HOLDING. Is that accurate, we're talking about the Instagram that you created?
A. Yes.
Q. Okay. And am I right, sir, that you personally post on this Instagram account, right?
A. No. I had someone else actually, her name is Lea, post these photos.
Q. Gotcha. At what point -- were you at any point posting on WHAT I'M HOLDING?
A. Yeah, we shared.
Q. Okay. At what point did -- was there any point in the beginning days in

Page 242

1 which only you were posting on WHAT I'M
2 HOLDING?
3     MR. TANCK:  Object to form,
4  vague.
5 A.    I, I don't remember.  We were
6 doing it pretty -- we were sharing.
7 But, yeah, I don't remember specifically
8 how we divvied up.
9 Q.    Okay.  Do you recall when -- and
10 what is Lea's last name for the record?
11 A.    I think it's Rosenbaum.
12 Q.    Okay.  Do you recall when
13 Ms. Rosenbaum start -- Ms. Rosenbaum
14 started to use the Instagram account
15 WHAT I'M HOLDING with you?
16 A.    No.
17 Q.    Okay.  Do you recall what year?
18 Can you pinpoint it in any way?
19 A.    No.
20 Q.    Okay.  So sitting here today,
21 it's your testimony, sir, that you have
22 no recollection whatsoever as to when
23 Ms. Rosenbaum started using the WHAT I'M
24 HOLDING Instagram account; is that
25 right?

Page 243

1 A.    That's right.
2 Q.    Okay.
3 A.    We both had the same log in, so.
4 Q.    Gotcha.
5     MS. ESFANDIARIFARD:  And if we
6  pull up Tab 40 which we'll -- I'm
7  sorry.  So Tab 40A will be Exhibit 10
8  and Tab 40 will be Exhibit 11.
9     (Exhibit 11, post from WHAT I'M
10  HOLDING dated October 2nd, 2014 was
11  marked for identification.)
12     MR. TANCK:  I'm going to object
13  to the documents for the record.
14     MS. ESFANDIARIFARD:  I'll address
15  that in a second, Mr. Tanck.
16 Q.    Mr. Gaines-Ross, I'm displaying a
17 post from WHAT I'M HOLDING and it's
18 dated October 2nd, 2014; is that right?
19 A.    Yes.
20 Q.    Do you have any reason to doubt
21 that this is a true and accurate post
22 from the Instagram which you were --
23 belongs to you and is on your LinkedIn
24 called WHAT I'M HOLDING?
25 A.    I don't, I don't remember this

Page 244

1 photo.
2 Q.    Understood.
3 A.    But, I mean, I don't think you
4 would make a fake version of it.  So
5 this looks accurate.
6 Q.    I appreciate that, sir.
7     MS. ESFANDIARIFARD:  And for the
8  record, this is pictured in the
9  Instagram is a, what appears to be a
10  bag of coffee beans or coffee,
11  perhaps the beans have been ground,
12  I'm not sure, and it's titled Rise Up
13  Roasters House Roast.
14 Q.    Is that correct?
15 A.    I believe, yeah, Rise Up.  I'm
16 not sure how they would pronounce it,
17 but yeah.
18 Q.    Okay.
19 A.    Looks like one word.
20 Q.    Okay.  And the caption of the
21 Instagram picture is (Reading:)  This
22 coffee does the job... daily. Energy,
23 roasted flavor, and warmth rolled up
24 into one.  Keeps you moving like the
25 good old energizer bunny!  And then

Page 245

1 there is an at or tagging of Rise Up
2 Coffee and energizer; is that correct,
3 sir?
4 A.    Yes.
5 Q.    And then there are several
6 hashtags following that title.  The
7 first reads (Reading:)  Hashtag coffee,
8 the second reads hashtag beans, the
9 third reads hashtag roasted, the fourth
10 reads hashtag fair trade, the fifth
11 reads hashtag organic, and the sixth
12 reads VSOPM and the final reads hashtag
13 WHAT I'M HOLDING with a palm emoji.
14     Did I read those all correctly,
15 sir?
16 A.    Yes.
17 Q.    And this image was posted of Rise
18 Up Coffee Roasters in October 2 of 2014,
19 before you and your co-founders came up
20 with the brand for RISE Brewing Company
21 in 2015 onward, correct?
22     MR. TANCK:  So hold on.  I'm
23  going to object to lacks foundation,
24  authenticity and also
25  mischaracterizes the witness' prior

Attorneys Eyes Only

Page 310

```
 1  somewhere between four to seven
 2  individuals from Pepsi?
 3       MR. TANCK:  Objection to form.
 4  A.   That sounds right.  It's within
 5  that range.
 6  Q.   Understood.  Did you ever sign a
 7  nondisclosure agreement or NDA with
 8  PepsiCo in connection with this meeting?
 9  A.   I don't recall.
10  Q.   To the best of your recollection,
11  did you ever sign an NDA or
12  nondisclosure agreement with PepsiCo
13  while working at RISE Brewing Company?
14  A.   I don't recall.  So long ago.
15  Q.   Okay.  So sitting here today you
16  just don't remember one way or another
17  if you've ever signed an NDA with
18  PepsiCo; is that correct?
19  A.   No.
20  Q.   That's not correct?
21  A.   Sorry, that is correct.
22  Q.   Okay.  Have you signed numerous
23  NDAs over the course of your career?
24  A.   Yes.
25  Q.   Understood.
```

Page 311

```
 1  A.   Many.
 2  Q.   Understood.  You would agree with
 3  me, sir, that in the companies you've
 4  co-founded, including RISE Brewing
 5  Company, one of your goals has been what
 6  you refer to as an exit; is that fair?
 7       MR. TANCK:  Object to form.
 8  A.   My goal with every company I've
 9  started is under the assumption to be
10  doing what I -- what I do when starting
11  that company for the rest of my life.
12  And if I can make money doing it and
13  keep on growing those revenues, then for
14  myself like salary-wise, then that's
15  great.  That's what I want to do for the
16  rest of my life.
17       If I at times when I leave
18  because I decided to or whatever, you
19  know, the hope is that, yeah, sure,
20  there's some sort of exit down the road
21  if you have equity or stock.  I don't
22  know how much I have in, in RISE.  But a
23  potential route is to either keep on
24  doing it or to have an exit or you
25  close.
```

Page 312

```
 1       So it's kind of like three, it's
 2  three options.  So one, having an exit
 3  is one of three options.
 4  Q.   What is your definition, sir, of
 5  having an exit in the companies you've
 6  co-founded?
 7  A.   Going public, merger,
 8  acquisition.
 9  Q.   Would you agree with me that
10  while you were at RISE Brewing Company,
11  it would have been beneficial to have a
12  company like Pepsi acquire RISE Brewing
13  Company?
14       MR. TANCK:  Objection, calls for
15    speculation.
16  A.   While I was at RISE?
17  Q.   Yes, sir.
18  A.   I don't recall how I felt then.
19  I would defer to like what the financial
20  terms would be in that type of M&A deal.
21  So I -- not every exit is a good thing.
22  Q.   To your recollection, have you
23  ever described success at Plant People
24  or RISE Brewing Company as a situation
25  in which there was an exit?
```

Page 313

```
 1       MR. TANCK:  Object to form.
 2  A.   I don't recall.  But given that
 3  there's three ways a company ends, which
 4  is M&A, do it for the rest of your life
 5  or have an exit, I could see myself
 6  saying something like that.
 7  Q.   And you could see yourself saying
 8  something like that because you would
 9  agree with that concept, right, sir?
10       MR. TANCK:  Object to form,
11    vague.
12  A.   It depends on what the terms are
13  of the exit for me to say if it's good
14  or bad.
15  Q.   If the terms of the exit are
16  favorable, you would agree that you
17  could see yourself saying that because
18  you agree with that concept, right?
19       MR. TANCK:  Objection to whatever
20    "that" is.  I don't even know what
21    "that" is any more, but I object to
22    the question and vague.
23  A.   Again, I can't say something is
24  generally favorable unless I know the
25  terms.  So if you want to present like a
```